BURT E. RUCKER v. HIGH POINT MEMORIAL HOSPITAL, INC., AND HORACE HENRY STOVALL, M.D.

No. 7418SC20

(Filed 20 February 1974)

1. **Evidence § 50; Physicians and Surgeons, Etc. § 15— malpractice action — medical testimony — practice in community**

     The trial court in a medical malpractice case properly refused to allow testimony of plaintiff's expert witness into evidence where the injury complained of occurred in High Point, the witness was a physician from New Orleans specializing in surgery, the witness did not testify to any knowledge which would qualify him to compare the treatment and diagnosis afforded by defendant to the community of High Point or any similar community, and the witness did not qualify himself to testify with respect to the standard of care in High Point.

2. **Evidence § 50; Physicians and Surgeons, Etc. § 11— malpractice action — expert testimony improperly excluded**

     Where the trial court in a medical malpractice case properly refused to let the testimony of plaintiff's expert witness be submitted to the jury, the trial court should have allowed plaintiff to bring in another witness to testify, though the proposed witness was not listed as a witness for plaintiff on the pretrial order, conditioned upon defendants' examining the jury with respect to the witness and plaintiff's submitting to a mistrial if prejudice to defendants appeared.

3. **Master and Servant § 3; Physicians and Surgeons, Etc. § 16— doctor in hospital emergency room — employment relationship**

Trial court erred in directing a verdict against plaintiff in favor of defendant hospital on the basis that plaintiff had failed to show that the individual defendant was the agent or employee of the hospital where plaintiff introduced a contract between defendants which stated working hours, benefits, salary, duties, and restrictions with respect to outside employment, and thus created an employment relationship and not an independent contractor.

APPEAL by plaintiff from *Lupton, Judge,* 26 March 1973, Civil Session Superior Court, GUILFORD County. Argued in the Court of Appeals 22 January 1974.

This action was instituted on 13 November 1970; and by it plaintiff seeks damages for loss of use of his left leg, medical expense, and loss of work all of which he alleges resulted from medical malpractice of defendant Stovall in the emergency room of defendant Hospital. Plaintiff alleges that defendant Stovall was an employee of defendant Hospital.

Plaintiff was accidentally shot in his left leg by a friend with whom he was rabbit hunting. The shot was from a distance of about 50 feet. The incident occurred about 10 o'clock a.m. on 22 November 1969. The outer aspect of plaintiff's lower left leg was peppered with a load of number four shotgun pellets in an area about the size of a man's hand. Plaintiff was immediately carried by his friend to Dr. Armstrong, a general practitioner in Mount Gilead. Dr. Armstrong cleansed the wound with Phisohex and applied pressure dressings and administered Demerol for pain and a tetanus toxoid. He advised plaintiff to go to the hospital in Troy. Plaintiff professed a preference to go to his home town, High Point. Dr. Armstrong instructed plaintiff to receive immediate medical care when he got to High Point.

Plaintiff was taken from Mount Gilead directly to High Point Memorial Hospital, arriving at the emergency room at approximately 1:30 p.m. At this time, plaintiff was in severe pain and unable to walk. A secretary took basic information from plaintiff, and one of the emergency room nurses took his blood pressure and removed the dressing. Defendant was an emergency room staff physician and was on duty that day. He looked at the wound, ordered an injection of an antibiotic and pain medication, told plaintiff to apply heat to the wound, to go home, and that he would be all right. Defendant never touched the leg or otherwise examined it other than by looking at it. No

X-rays were taken or ordered. Defendant did not have admitting privileges but did not refer plaintiff to a surgeon with admitting privileges. He did tell plaintiff to see his family doctor, but plaintiff was unable to see his family doctor until Monday morning, this being a Saturday.

Plaintiff went home, arriving there about 2:30 p.m. The pain become more severe and plaintiff became nauseated. He was unable to stay in bed because of the pain and, with his wife's help, hopped around a bit from one room to another. Plaintiff's wife contacted her employer, who arranged for her family physician to meet plaintiff at the emergency room in order that he might give plaintiff something for the nausea and the pain.

At approximately 5:30, plaintiff's wife and their older daughter arrived at the emergency room. Defendant was still on duty. Dr. Auman, a doctor of internal medicine, met plaintiff there and discussed the situation with defendant who told Dr. Auman what he had already given plaintiff. He ordered medication for pain (75 milligrams of Demerol) and nausea (25 milligrams of Thorazin), but did not remove the dressing or administer any other treatment. Dr. Auman did not profess to be a surgeon. The pain medication put plaintiff to sleep, and he rested until early Sunday morning.

During Sunday the pain became more intense, plaintiff more nauseated, and his leg began to swell, drain, and a foul odor was noticed coming from the wound. One of plaintiff's daughters, a registered nurse, came from Winston-Salem and cared for plaintiff during Sunday. Both she and plaintiff's wife tried to reach their family doctor, Dr. Jones, and a surgeon. They were not successful. The daughter continued to apply heat to the wound and changed the dressing sterilely.

On Monday morning, 24 November 1969, plaintiff was taken to his family physician, Dr. Jones, who immediately sent him to the hospital and referred him to Dr. Parham, a surgeon. Dr. Parham immediately had plaintiff admitted to the hospital and ordered X-rays, lab studies and other examinations. A culture of the drainage from the wound revealed that some species of clostridium were present, and X-rays were consistent with a diagnosis of gas gangrene.

On Wednesday, 26 November 1969, plaintiff, at the direction of Dr. Parham, was moved to Duke Hospital for treat-

ment in the hyperbaric chamber. Plaintiff remained at Duke approximately one month. During that time, several operative procedures were performed removing dead tissue in an attempt to salvage the leg from the gangrene infection. Plaintiff was returned to High Point Hospital where, over a period of several months, skin grafts were done to cover the exposed bone and flesh.

The leg was, of course, deformed and disfigured. Plaintiff lost the entire outer muscle chamber in the lateral portion of the left lower leg. The left leg had atrophied, and the ankle had turned inward, limiting it severely in side-to-side and up-and-down movement. The muscles left in the left leg were weak. The perineal nerve in that leg was totally lost. The evidence was that plaintiff had lost 75% of the functional use of the leg. He was required to wear a type of brace which makes the foot move when he walks, but because of the ankle turning inward, he walked on the side of the foot which had become calloused.

At trial plaintiff offered the testimony of Dr. Julius L. Levy. He was found by the court to be an expert physician specializing in surgery. Dr. Levy is from New Orleans. Over defendants' objection he was not allowed to testify as to standards for treatment of gunshot wounds nor to testify concerning whether defendant Stovall's actions in his treatment of plaintiff constituted good medical or surgical procedure or conformed to the standards for treatment.

After plaintiff learned that the expert witness would not be allowed to testify before the jury, he asked for early adjournment in order to reassess his position. He had listed his witnesses on a pretrial order. Dr. Thomas Wood was not listed thereon. Plaintiff asked permission to call him. Defendants objected and the court refused to allow Dr. Wood to testify. Defendants' motion for a directed verdict was allowed and plaintiff appealed.

*Schoch, Schoch, Schoch and Schoch, by Arch Schoch, Jr., for plaintiff appellant.*

*Henson, Donahue and Elrod, by Perry C. Henson, for defendant Stovall appellee.*

*Sapp and Sapp, by Armistead W. Sapp, Jr., for defendant High Point Memorial Hospital, Inc., appellee.*

MORRIS, Judge.

[1]  Plaintiff argues, by his assignment of error No. 2, that the trial court committed reversible error in excluding the testimony of Dr. Levy.

There is certainly no question but that Dr. Levy is eminently qualified. He is certified by the American Board of Surgery, a Fellow of the American College of Surgeons, the International College of Surgeons, and the American College of Gastroenterology. He was visiting surgeon at Charity Hospital in New Orleans, and consultant at Alexandria, Louisiana, Veterans' Memorial Hospital, Charity Hospital in Alexandria, Louisiana, Lallie Kemp Charity Hospital in Independence, Louisiana, and Keesler Air Force Base Hospital in Biloxi, Mississippi. At the time of the trial he practiced at Touro Infirmary, East Jefferson General Hospital, and Sara Mayo Hospital, all in New Orleans. He had written 12 papers on various aspects of surgery which had appeared in the American Journal of Surgery, Southern Medical Association Journal, Journal of Louisiana State Medical Association, and Journal of Surgery. He was an Associate Professor of Surgery on a part-time basis at Tulane University Medical School and since 1965 had continued his private practice in New Orleans and his association with the University.

Dr. Levy testified, on the qualified examination of defendants, that he had no knowledge with respect to High Point; that he did not know whether Memorial Hospital was accredited; that he had never been there; did not know how many Board certified surgeons practiced in High Point; did not know how many surgeons, doctors, or residents practiced in High Point; knew nothing of the nature and extent of the library in High Point Memorial Hospital or the nature and extent of a medical library available to surgeons practicing in High Point within a 25-mile radius; that he did not know whether High Point Memorial Hospital was approved for medical care.

During his testimony out of the presence of the jury, Dr. Levy testified that he came to High Point to testify as to his observations from some facts concerning one patient and was not prepared to discuss standards of medical practice until the night before he took the stand. He testified: "To the best of my knowledge, the treatment of gunshot wounds of the extremities is standard throughout the United States, among quali-

fied surgeons," and "The standards for the treatment of gun-shot wounds are dictated not by local custom, but by national publications and national organizations, and by training in medical schools and residency programs, which are standardized by various agencies throughout the Country." Further, "I do not know of any variations of the standards of the management of gunshot wounds of the lower extremities from any one community to another, not within the United States. To the best of my knowledge, the standards of care are the same from one community to the other."

Dr. Levy unequivocally testified that when plaintiff first came to the emergency room he should have been referred to a surgeon with admitting privileges and that if a physician without admitting privileges undertook to care for the wound as described, "if that circumstance existed, then I would say that he was not living up to the standards demanded by the medical profession in this Country. I am saying if the medical staff of that hospital said that is all right, then they were not living up to the standards all over this Country. Just to clarify that . . . I don't think the medical staff of a hospital sets the medical standards in a community. It is set by a much greater area than one tiny locality. In a community of this size, with qualified people in it, qualified surgeons in it, if the doctors who serve the community don't live up to the standards I have described, then they shouldn't be practicing medicine." He further testified: "I am saying a standard for the metropolitan community of this sort; and I again reiterate in a community of this size, this sort, in a hospital with a qualified medical staff, they should live up to the standards dictated around the Country; and if everyone doesn't live up to those standards, then everyone in that group is guilty."

It is obvious that Dr. Levy has set very high standards for himself and would like for all practicing physicians to set high standards for themselves. We cannot disagree with this desire. Practically, however, this is a theoretical optimum impossible of achievement.

In *Dickens v. Everhart*, 284 N.C. 95, 100, 199 S.E. 2d 440 (1973), Justice Lake, quoting from *Hunt v. Bradshaw*, 242 N.C. 517, 88 S.E. 2d 762, and citing other cases to the same effect, set out the basis of liability of a physician or surgeon for negligence in the care of his patients as follows:

"A physician or surgeon who undertakes to render professional services must meet these requirements: (1) He must possess the degree of professional learning, skill and ability which others similarly situated ordinarily possess; (2) he must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case, and (3) he must use his best judgment in the treatment and care of his patient. [Citations omitted.] If the physician or surgeon lives up to the foregoing requirements he is not civilly liable for the consequences. If he fails in any one particular, and such failure is the proximate cause of injury and damage, he is liable."

Justice Lake, writing for a unanimous Court, continued:

"In *Wiggins v. Piver*, 276 N.C. 134, 171 S.E. 2d 393, this Court rejected the 'locality rule' to the effect that, in order to recover on the ground of failure to possess or use the requisite professional skill and ability, the injured patient must prove that the defendant failed to possess or use the skill and ability customary in the community in which the service was rendered. We there reaffirmed the rule that the physician or surgeon must possess the degree of learning, skill and ability which other *similarly situated* ordinarily possess. Thus, the general practitioner is not liable by reason of his failure to possess the degree of knowledge and skill ordinarily possessed by a specialist in the field of his specialty. Similarly, the character of the community in which the defendant practices is a circumstance to be considered in determining the degree of skill and ability to be required of him. Prosser on Torts, 3rd ed., Negligence, p. 166. He is, however, held to the standard of professional competence and care customary in similar communities among physicians engaged in his field of practice. Thus, in *Wiggins v. Piver*, we held that an expert witness, otherwise qualified, may state his opinion as to whether the treatment and care given by the defendant to the particular patient came up to the standard prevailing in similar communities, with which the witness is familiar, even though the witness be not actually acquainted with actual medical practices in the particular community in which the service was rendered at the time it was performed."

It is obvious that Dr. Levy testified with respect to national standards. Plaintiff asked a hypothetical question in the absence of the jury and asked Dr. Levy whether he had an opinion satisfactory to himself and to a reasonable medical certainty as to whether the "diagnosis and treatment afforded by Dr. Stovall to the plaintiff were in conformity with the approved practice and principles of the medical profession *in this community or similar communities*." Dr. Levy answered that he had an opinion which was "That the diagnosis and treatment as afforded by Dr. Stovall were not in conformity with the usual practice of this community or similar communities."

We agree with the trial court that Dr. Levy had not testified to any knowledge which would qualify him to compare the treatment and diagnosis afforded by defendant Stovall to the community of High Point or any similar community, nor had he qualified himself to testify with respect to the standard of care in High Point or any similar community.

We think that what was said in *Lockhart v. MacLean*, 77 Nev. 210, 361 P. 2d 670 (1961), is applicable. There an operation took place in Reno, Nevada. Infection of the bone developed. A malpractice suit was brought and, in support of motion for summary judgment, plaintiff sought to use the deposition of a surgeon from Oakland, California. The trial court refused to consider it; and on appeal, the Court said:

"We are in accord with the views expressed by the trial court that, in the instant case, there was no sufficient showing in Dr. Tepper's affidavit to qualify him to give an opinion admissible in evidence that the diagnosis, pre-operative, operative and post-operative procedures taken and followed by defendants were not in accordance with the standard of conduct of surgeons and orthopedic surgeons practicing in Reno, Nevada. Dr. Tepper's affidavit showed that such procedures on the part of respondents were not in accordance with those standards throughout the United States in the particulars mentioned in his affidavit. His affidavit shows that, with the exception of training had by him in Denver, Colorado in 1943 and in Kansas City the following year, the affiant had received all of his other education and training and had conducted his practice solely within the State of California. Under the argument advanced by appellants, based upon the background referred to, Dr. Tepper would be competent to testify concerning the

standards of surgeons in communities of all sizes, urban or rural, accessible or isolated, without regard to the relative medical facilities of the same or how widely separated from each other, so long as within the United States. Neither practice nor presence at any time in the community would be a prerequisite to the competency of the witness.

Under the present facts we consider that the liberalizing of the rule pertaining to competency, based upon knowledge of standards of surgeons and orthopedic surgeons, to the extent of making the locality the entire geographic United States would, in effect, constitute such an extensive and unjustifiable relaxation of the locality rule as to amount to an abandonment of the same. Even though under certain circumstances and in the furtherance of justice the trial court might, in the exercise of its discretion relax the locality rule so as to permit competency of an expert witness to be established by a showing of knowledge of standards in a similar rather than the same locality, this would in no way constitute a recognition of the principle here contended for by the appellant." 361 P. 2d, at 673-674.

In oral argument, plaintiff advanced the theory that Dr. Levy was competent to express his opinion as he did in the absence of the jury because he and defendant Stovall were *similarly situated.* This, he argued, meant medical education, preparation for specialty, size and type of medical school attended, size and type of hospitals with which each was associated, etc. Even if we were to agree with plaintiff's interpretation of the meaning of the phrase "similarly situated" as used in *Dickens v. Everhart, supra,* and we do not, it is obvious from the record that Dr. Levy and Dr. Stovall were not similarly situated. We do not deem it necessary to list the dissimilarities; suffice it to say, they are numerous. The trial court properly refused to allow Dr. Levy's testimony to be heard by the jury.

Plaintiff next asisgns as error the court's refusal to admit into evidence certain exhibits. The court excluded plaintiff's exhibit 4 as to defendant Hospital, but admitted it as to defendant Stovall. This was the emergency room record. For reasons discussed hereinafter, the court should have admitted the exhibit as to defendant Hospital. The court also admitted one page of

exhibit No. 7 as to defendant Stovall but not as to defendant Hospital. This page was the laboratory reports. For the same reasons, the court erred in refusing to admit this exhibit as to defendant Hospital. The remainder of the exhibits tendered and refused were in patient records at High Point Hospital. Plaintiff introduced the records as primary substantive evidence for use in framing a proper hypothetical question. He relies on *Sims v. Insurance Co.*, 257 N.C. 32, 125 S.E. 2d 326 (1962). There the records were used for impeachment purposes. Plaintiff here did not, technically, adhere to the rules laid down in *Sims* for laying the foundation for the introduction of hospital records. We think the court properly excluded the exhibits. We note, however, that plaintiff was able to frame a proper and adequate hypothetical question without the use of the exhibits. That his hypothetical question was proper and adequate is conceded by defendant Stovall in his brief.

[2] Plaintiff's assignment of error No. 4 is addressed to the court's refusal to allow plaintiff to call Dr. Thomas Wood as a witness. We think plaintiff's position is well taken. We do not know what Dr. Wood's testimony would have been because the court refused to allow plaintiff to put it in the record. We cannot know, therefore, whether Dr. Wood's evidence would have been sufficient to carry plaintiff's case to the jury. Although he was not listed as a witness for plaintiff on the pretrial order, defendants' argument that they were not prepared to cross-examine him on just overnight notice is fallacious in view of their expert cross-examination of other medical witnesses for plaintiff. Their argument that the jury had not been examined as to this witness also fails in view of plaintiff's offer at trial to agree for defendants to examine the jury with respect to this witness before he testified and further, if it appeared to defendants that one or more should be excused, the court could declare a mistrial. Dr. Wood was a partner of a witness who had testified for plaintiff and about whom the jury had been questioned. The witness's evidence could not have been merely cumulative. Plaintiff informed the court that the witness would testify with respect to standards of care in High Point. No evidence as to this had been elicited at that time as the court had properly refused to allow Dr. Levy to testify as to standards and defendant Stovall's violation of them. Plaintiff was taken by surprise when it appeared that the testimony of his expert witness would not be submitted to the jury. We are of the opinion that, under the circumstances of this case, the trial court should have exer-

cised his discretion in favor of allowing plaintiff to bring in another witness to testify conditioned upon defendants' examining the jury with respect to the witness and plaintiff's submitting to a mistrial if prejudice to defendants appeared.

One further question must be discussed. The court in its order directed a verdict for defendant Hospital on the basis that plaintiff had failed to show that defendant Stovall was the agent, servant, or employee of defendant Hospital, but, on the contrary, all the evidence showed that defendant Stovall was an independent contractor. We disagree.

[3] Plaintiff's exhibit 11, introduced into evidence without objection by defendants (with the exception of objection to an insurance provision), is a contract between defendant Hospital and defendant Stovall. Under the contract, defendant Stovall is employed at a guaranteed salary of $24,000 per year as a member of a four-man team to work in the emergency room. The 12-hour shifts seven days per week were to be worked out by Stovall and the other three. The hospital was to collect all fees; and, in the event of collection of fees exceeding the guaranteed salaries, any excess would be divided among the emergency room doctors. They were to see all patients coming to the emergency room. When services of a specialist were required, the emergency room doctor was to call a specialist on backup call. The contract specifically provided: "All services of the Emergency Department Physicians are to be performed in a manner as to further the best interest of the hospital including the best possible care and treatment of the patient with special emphasis on the maintenance of good public relations." The contract further provided for one month's vacation for each year of service with the hospital responsible for securing temporary replacement. Further, each physician was allowed three days per year to attend scientific meetings and 12 days per year sick leave which could be cumulative for a period of three years or a total of 36 days. The hospital was to arrange for replacement in event of illness but reserved the right to compensate the group for doubling up. The physicians were allowed one year to phase out their private practice, and they agreed that they would not accept other work in their off duty hours which would amount to going into private practice in competition with the members of the active medical staff. It appears to us that this clearly creates an employment relationship and not an independent contractor. We,

therefore, hold that the court erred in directing a verdict against plaintiff in favor of defendant Hospital.

For the reasons stated, there must be a

New trial.

Chief Judge BROCK and Judge CARSON concur.