Jessica SHUMAKER, by her guardian ad litem, Jesse Shumaker; Jesse Shumaker; and Donna Shumaker, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Jessica SHUMAKER, by her guardian ad litem, Jesse Shumaker; Jesse Shumaker; and Donna Shumaker, Plaintiffs,

v.

UNITED STATES of America, Defendant and Third–Party Plaintiff,

and

Dr. David Johnson, Defendant,

and

Caswell Family Medical Center, Inc., Defendant and Third–Party Defendant.

Civ. Nos. C–85–932–G, C–85–995–G.

United States District Court,
M.D. North Carolina,
Greensboro Division.

July 15, 1988.

Jon Berkelhammer, Bynum M. Hunter and Alan W. Duncan, Greensboro, N.C., and Jess Moore, Reidsville, N.C., for plaintiffs.

Robert H. Edmonds, J., U.S. Atty., J. Reed Johnston, Jr., Frederick K. Sharpless, Joseph E. Elrod, III, Greensboro, N.C., and Michael R. Mitwol, Wilmington, N.C., for

defendants and defendant and third-party defendant.

## MEMORANDUM OPINION

BULLOCK, District Judge.

This matter comes before the court on the various Defendants' motions for summary judgment and the Defendant United States of America's motion for judgment on the pleadings. The action arises from alleged medical malpractice by two doctors, Gahear F. Hamlor and David W. Johnson, in failing to refer Jessica Shumaker to an ophthalmologist. Plaintiffs Jessica and her parents allege that as a result of the doctors' alleged negligence, and the allegedly negligent failure of Caswell Family Medical Center to supervise the doctors and to implement a quality assurance program, diagnosis and treatment of Jessica's bilateral retinoblastomas (cancerous tumors in the eyes) was delayed, reducing her chances of retaining her vision and ultimately necessitating the enucleation of both of her eyes.

At the time of his alleged malpractice, Dr. Hamlor was fulfilling his public service obligation with the National Health Service Corporation ("NHSC"), a branch of the United States Department of Health and Human Services. Upon learning of Dr. Hamlor's status Plaintiffs brought a second suit against Dr. Hamlor. Thereafter, the suits were consolidated and pursuant to 42 U.S.C. § 233 the United States was substituted for Dr. Hamlor as a party defendant and Dr. Hamlor was dismissed from both suits.

Like Dr. Hamlor, Dr. Johnson also practiced at Caswell Family Medical Center ("CFMC") to fulfill his NHSC obligation but did so on a private contract basis and Plaintiffs did not allege liability of the United States for Dr. Johnson's actions. CFMC is named as a defendant for the negligence of Drs. Johnson and Hamlor under the theory of *respondeat superior*. In addition, Plaintiffs also made claims against CFMC for its independent negligence in failing to supervise the doctors, institute a quality assurance program, or maintain proper patient records. Plaintiffs further claim that CFMC was negligent in hiring and holding out Dr. Johnson as qualified, but the court finds no reasonable factual basis for this contention and rejects it without discussion.

Defendants have moved for summary judgment, challenging the sufficiency of Plaintiffs' evidence, particularly on the issue of causation. Specifically, they assert that expert testimony attributing Jessica's lost vision to the delay in diagnosis and treatment is speculative and does not meet the legal proof requirements. Defendants also contend that Plaintiffs did not plead their claim based on lost chance of Jessica retaining her eyes, but conjured it up only after discovery was completed and Defendants had filed their motions for summary judgment.

In addition to the common bases for Defendants' motions CFMC also asserts that Plaintiffs have failed to produce evidence of a standard of care for a rural family practice clinic, of breach of such standard by CFMC, or alternatively of a causal link between any possible breach and the resulting injury. Finally, CFMC contends that the NHSC was solely responsible for Dr. Hamlor's actions and that since he was not CFMC's agent, *respondeat superior* does not apply; similarly, Dr. Johnson was not an employee or agent but an independent contractor, for whose actions CFMC is not liable.

For the reasons discussed below, the court grants CFMC's motion for summary judgment as to the parts of Plaintiffs' claims attributing liability to CFMC for Dr. Hamlor's alleged negligence and for hiring and holding out Dr. Johnson as qualified, but otherwise denies summary judgment as to all Defendants on all other claims. The court also denies the United States' motion for judgment on the pleadings.

## FACTS

Jessica Shumaker was born in Caswell County, North Carolina, on February 17, 1981. Beginning in March 1981 and continuing periodically through at least November 1982 Jessica's parents brought her to the Caswell Family Medical Center in

Yanceyville, Caswell County, North Carolina, for well-baby and minor illness related examinations. Caswell County is a designated health manpower shortage area under 42 C.F.R. § 23, and CFMC is a rural family practice clinic intended to supply basic health care to citizens of the county. CFMC, a federal-grant-funded center, was periodically assigned doctors through the NHSC. Dr. Hamlor fulfilled a two-year commitment to NHSC by practicing at CFMC from August 1980 until August 1982. During that time his paychecks, vacation time, and continuing medical education were handled through the NHSC. Between March 1981 and July 26, 1982, Dr. Hamlor, who was a certified family practitioner, examined Jessica at CFMC on numerous occasions.

Jessica's mother, Donna Shumaker, claims that starting in August 1981 she noticed that Jessica's left eye would wander, rather than focusing in conjunction with the right eye. Mrs. Shumaker alleges that she brought this condition to Dr. Hamlor's attention on numerous occasions, during regular visits to CFMC, and that Dr. Hamlor passed the problem off as a "lazy eye" and said that if it did not correct itself by the time Jessica turned two years old they would correct it by patching her right eye. Neither CFMC's records nor any other notes by Dr. Hamlor indicate complaints about Jessica's eyes or that Dr. Hamlor examined her eyes. Plaintiffs nevertheless assert that the problem worsened over time but Dr. Hamlor's advice remained the same.

Dr. Johnson is a general practitioner who came to CFMC in September 1982 to fulfill a commitment to NHSC under the "private practice option." Upon placement at CFMC Dr. Johnson entered into an "Agreement to Provide Professional Services" with CFMC, through its project director, Stephen Shore. From September through November or December 1982, Dr. Johnson saw Jessica several times. Donna Shumaker asserts that she called Jessica's wandering eye to Dr. Johnson's attention and also informed him of Dr. Hamlor's diagnosis that it was simply "lazy eye." Dr. Johnson concurred in this diagnosis and did not refer Plaintiffs to an ophthalmologist. Dr. Johnson contends that he reviewed Dr. Hamlor's notes on his patients which do not indicate anything about Jessica's eyes.

In late December 1982 or early January 1983, Donna Shumaker visited her optometrist, Dr. B. Daniel Jason, for herself, and while there requested that he see Jessica. Dr. Jason looked at Jessica in his waiting room, without the use of any instruments and "sensed" that she had a more serious problem with her eyes. He referred her to Dr. Charles C. Freed, an ophthalmologist in Danville, Virginia, which is approximately 15 miles from Yanceyville. Dr. Freed examined Jessica on January 14, 1983, under anesthesia, and made the initial diagnosis of retinoblastoma. He then referred her to Dr. Thomas C. Kerns, Jr., at McPherson Hospital in Durham, North Carolina. Dr. Kerns examined Jessica on January 19, 1983, concurred in the diagnosis, and referred her immediately for treatment to Dr. Robert M. Ellsworth at the Cornell University Medical School, Sloan–Kettering Hospital in New York City. Dr. Ellsworth is recognized by experts for both sides as one of the foremost experts, if not the foremost expert, on treatment of retinoblastoma.

Dr. Ellsworth observed several cancerous lesions in each of Jessica's eyes and began radiation treatments and then cryotherapy (freezing). Dr. Ellsworth apparently believed that there remained a good chance of saving the eyes, either a two in three chance, or perhaps a 35% chance of saving the left eye and a 60%–70% chance of saving the right eye. From Dr. Ellsworth's comments the treatment seemed to be proceeding well for a time, but gradually Jessica lost sight in her left eye, which was removed on November 11, 1983. Subsequent treatment of the right eye also failed, and on February 23, 1984, it was removed.

Jessica's cancer apparently did not metastasize prior to enucleation and she is currently healthy, but without sight.

## DISCUSSION

Federal jurisdiction over this case is based on 42 U.S.C. § 233(a), which provides

that the exclusive remedy against the United States for tortious conduct by an employee or officer of the Public Health Service (including the NHSC), acting within the scope of his employment, is under the Federal Tort Claims Act (FTCA), specifically 28 U.S.C. §§ 1346(b) and 2672. The parties recognized Dr. Hamlor's status with the NHSC and the action accordingly was removed to this court, with the United States replacing Dr. Hamlor as a defendant. The court exercises pendent jurisdiction over the remaining claims which arise from a common nucleus of operative fact. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

■ As with pendent state law claims, actions brought under the FTCA are controlled by the substantive law of the state in which the alleged negligence occurred. *See Horton v. United States,* 622 F.2d 80, 82 (4th Cir.1980); *Garrett v. Jeffcoat,* 483 F.2d 590, 592 (4th Cir.1973). Federal rules govern procedural questions, including the requisite standards for summary judgment and directed verdict, and the quantum of proof necessary to create a jury question. *Owens by Owens v. Bourns, Inc.,* 766 F.2d 145, 149 (4th Cir.), *cert. denied,* 474 U.S. 1038, 106 S.Ct. 608, 88 L.Ed.2d 586 (1985) (citing *Fitzgerald v. Manning,* 679 F.2d 341, 346 [4th Cir.1982]).

## I. *Summary Judgment*

In order to grant a motion for summary judgment the court must find that the materials submitted, including the pleadings, depositions, answers to interrogatories, admissions and affidavits, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). A genuine issue of fact is one which "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 101 (4th Cir.1987) ("There is no genuine issue for trial unless sufficient evidence favors the nonmoving party for a

jury to return a verdict for that party."). In making this determination, the court must view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985).

The burden is on the movant to show the absence of any genuine issue as to a material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). However, once the movant has brought forth evidence indicating the absence of any genuine issue the non-moving party may not rest on his pleadings but must produce evidence sufficient to raise an issue of fact, or must call the court's attention to supporting evidence in the record that was overlooked, ignored, or misinterpreted by the movant. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## A. The Negligence Claims

■ In order to recover on a medical malpractice claim, the Plaintiff must prove three elements founded in general principles of negligence: (1) the applicable standard of care; (2) Defendant's breach of that standard; and (3) the causal relationship between Defendant's breach and the Plaintiff's injury. *See Waffen v. United States Dept. of Health and Human Services,* 799 F.2d 911, 915 (4th Cir.1986) (citing *Fitzgerald v. Manning,* 679 F.2d 341, 346 [4th Cir.1982]); *Makas v. Hillhaven, Inc.,* 589 F.Supp. 736, 740 (M.D.N.C.1984) (to avoid directed verdict plaintiff must show standard of care, breach, proximate causation, and damages) (citing *Mitchell v. Parker,* 68 N.C.App. 458, 315 S.E.2d 76 [1984]); *White v. Hunsinger,* 88 N.C.App. 382, 383, 363 S.E.2d 203, 204 (1988) (plaintiff must prove breach of standard of care and that treatment proximately caused the injury).

### 1. Standard of care and breach

N.C.Gen.Stat. § 90–21.12 defines the standard of health care applicable in mal-

practice cases as "the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action."

The statutory standard is not the extent of a physician's duty to his patient, *Wall v. Stout,* 310 N.C. 184, 192–93, 311 S.E.2d 571, 576 (1984); he must also

> exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case; and ... must use his best judgment in the treatment and care of his patient.... If the physician or surgeon lives up to the foregoing requirements he is not civilly liable for the consequences. If he fails in any one particular, and such failure is the proximate cause of injury and damage, he is liable.

*Hunt v. Bradshaw,* 242 N.C. 517, 521–22, 88 S.E.2d 762, 765 (1955), *quoted in Wall,* 310 N.C. at 192–93, 311 S.E.2d at 576–77; *see also Assaad v. Thomas,* 87 N.C.App. 276, 278, 360 S.E.2d 503, 504 (1987), *disc. rev. denied,* 321 N.C. 471, 364 S.E.2d 917 (1988).

■ The particular standard of care to be applied must usually be established by expert testimony, *Fitzgerald,* 679 F.2d at 347; *Beaver v. Hancock,* 72 N.C.App. 306, 311, 324 S.E.2d 294, 298 (1985), *i.e.,* by testimony of other practitioners in that field of practice or experts equally familiar and competent to testify. *White v. Hunsinger,* 88 N.C.App. at 385, 363 S.E.2d at 205; *Makas,* 589 F.Supp. at 740 (citing *Lowery v. Newton,* 52 N.C.App. 234, 239, 278 S.E.2d 566, 571, *disc. rev. denied,* 304 N.C. 195, 291 S.E.2d 148 [1981]; *Smithers v. Collins,* 52 N.C.App. 255, 260, 278 S.E.2d 286, 289, *disc. rev. denied,* 303 N.C. 546, 281 S.E.2d 394 [1981] ). The exception occurs "[w]hen the jury, based on its common knowledge and experience, can understand, evaluate, and judge the legal reasonableness of a health care provider's actions." *Makas,* 589 F.Supp. at 740–41 (citing *inter alia Jackson v. Mountain Sanitarium & Asheville Agriculture School,* 234 N.C. 222, 225–28, 67 S.E.2d 57, 61–62 [1951] ).

### a. Standard of care for Drs. Hamlor and Johnson

■ In this case the voluminous deposition testimony submitted sufficiently explores the standards of care applicable to Drs. Hamlor and Johnson, and raises a genuine issue regarding their compliance with those standards. For example, Dr. Thomas W. Littlejohn, III, a general practitioner in Winston–Salem, North Carolina, stated that he routinely checks for retinoblastoma when he examines children, especially when the child has an abnormality such as a strabismus or deviation of gaze. Littlejohn Deposition at pp. 14–15. Dr. Littlejohn also said that a family doctor should refer to an ophthalmologist a patient he suspects of having a retinoblastoma or a patient older than six months who has strabismus or an uncoordinated movement of the eyes. *Id.* at pp. 16–17. Further, Dr. Littlejohn said that although he would not necessarily refer upon the first complaint of an abnormal gaze, *id.* at p. 25, if the parents later reiterated their complaint he would refer and note such referral in his medical records. *Id.* at p. 29. Based on CFMC's records, Dr. Littlejohn opined that Dr. Hamlor met the standard of care, *id.* at 32, but admitted that if Jessica's parents' contentions that they made repeated complaints are true then in his opinion Dr. Hamlor did not meet the standard of care. *Id.* at 34–35, 69.

Finally, Dr. Littlejohn opined that Dr. Johnson, who as a general practitioner did not have the same level of training as a family practitioner, should have referred Jessica to an ophthalmologist upon becoming aware of the complaints about her eyes, *id.* at 79, and said that the standard of care in Yanceyville is probably essentially the same as in Winston–Salem. *Id.* at 89. The court notes that, with respect to the question of when a referral should be made, any doctor should be competent to testify. *White v. Hunsinger,* 88 N.C.App. at 385, 363 S.E.2d at 205.

The record before the court does not include any evidence that either Dr. Hamlor or Dr. Johnson ever referred the Plain-

tiffs to an opthalmologist, nor is there any significant mention of Jessica's eye problems in Jessica's records, prior to January 1983. Therefore, the disputed factual issue of whether the Plaintiffs repeatedly complained to the doctors about Jessica's wandering or "lazy" eye is material to the question of whether Dr. Hamlor and Dr. Johnson satisfied the standard of care.

### b. Standard of care for CFMC

CFMC contends that the materials before the court do not establish a standard of care applicable to a small, rural health clinic; therefore summary judgment should be granted to CFMC on the claims alleging its independent negligence. The Plaintiffs assert that CFMC was negligent in failing to supervise the doctors and in not establishing a quality assurance program which would have implemented formal record keeping and review procedures. *See* "Proposed Amendments to Complaints," filed June 23, 1987, at pp. 2–3.

The court is not certain which general standard of care is applicable to CFMC. N.C.Gen.Stat. § 90–21.12 applies to "health care providers," defined in N.C.Gen.Stat. § 90–21.11 as including *inter alia* persons licensed, registered or certified by the State to engage in the practice of medicine. The definition also includes "hospitals," other persons responsible for the negligence of such persons or hospitals, and other persons acting at the direction or under the supervision of such persons or hospitals. A "hospital" is defined in N.C. Gen.Stat. § 131E–76(3) as a facility with an "organized medical staff and which is designed, used, and operated to provide health care ... primarily to in-patients" under the supervision of licensed physi-

cians. Whether an out-patient clinic such as CFMC qualifies as a hospital or otherwise falls under the definition of "health care provider" is not clear.

Nevertheless, even assuming that CFMC is a health care provider[1] its conduct may be scrutinized under a standard of due care, in addition to the statutory standard. In *Blanton v. Moses H. Cone Hospital,* 319 N.C. 372, 354 S.E.2d 455 (1987), the Supreme Court of North Carolina held an entity which clearly qualified as a "hospital" to a reasonable man or ordinary care standard with regard to certain general aspects of its operation, including selection of agents, selection, inspection and maintenance of equipment, and monitoring of the performance of its staff physicians.[2] 319 N.C. at 375–77, 354 S.E.2d at 458. *See also Burns v. Forsyth County Hospital Authority, Inc.,* 81 N.C.App. 556, 565, 344 S.E.2d 839, 846 (1986) (when breach does not involve medical services requiring special skills, the "standard of care of a reasonable, prudent person is generally the standard the courts have applied").

The state supreme court's application of ordinary principles of negligence to a medical malpractice case does not signal a departure from the statutory standard, however. As always in negligence cases, the pertinent issue is reasonableness under the circumstances, and the context in which to determine reasonableness may be defined by Section 90–21.12.[3] Although the reasonable man standard imposed a duty on Cone Hospital to monitor its staff physicians, the same might not reasonably be expected from a smaller health care facility. The standards of practice among

1. If CFMC is ultimately determined to be responsible for any negligence by Dr. Johnson, CFMC would be a "health care provider" under the statutory definition.

2. CFMC's attempt to distinguish *Blanton* as pertaining only to the doctrine of corporate negligence fails because the court in *Blanton* disregarded that label and equated the "doctrine" with ordinary negligence. 319 N.C. at 377, 354 S.E.2d at 459; *see also Bost v. Riley,* 44 N.C.App. 638, 647–48, 262 S.E.2d 391, 396, *disc. rev. denied,* 300 N.C. 194, 269 S.E.2d 621 (1980) (re independent negligence by hospital).

3. *Makas v. Hillhaven, Inc.* decided an issue which had not been confronted by the state supreme court; accordingly the *Makas* court had the responsibility to "apply the law as it appear[ed] the North Carolina Supreme Court would rule." 589 F.Supp. at 739. To the extent application of the *Blanton* decision to this case is inconsistent with the district court's holding in *Makas,* the court must follow the state law as espoused by the highest state court. However, the court believes that *Blanton* is not inconsistent with *Makas.*

health care providers with a similar make-up and in similar communities will be a predominant factor in what is reasonable. What *Blanton* indicates, however, is that other factors, such as failure to enforce the standards of the Joint Commission on the Accreditation of Hospitals, can be considered as evidence of negligence. 354 S.E. 2d at 458.

Whether or not the statutory standard applies, the materials in the record suggest a genuine issue regarding CFMC's negligence. The court especially notes the statements of Dr. Thomas A. Cable, a member of the in-house committee for the Family Practice Center at Moses H. Cone Hospital, regarding compliance with any applicable federal guidelines and with a quality assurance program. Dr. Cable emphasized the importance of review procedures, particularly over young physicians. Cable Deposition at pp. 12–14. Although Dr. Cable stated that not all small practices have formal or informal review of physicians, *id.* at 12–13, and that a two-person practice clinic need not have organized chart reviews, *id.* at 73, he also said that if there are federal guidelines which apply to the clinic he would expect those guidelines to be met or exceeded, *id.* at 75. Dr. Cable maintained that where an entity has a quality assurance program, designed to ensure proper patient care, its procedures should be followed. *Id.* at 14–15. Finally, Dr. Cable stressed the need in medical facilities with substantial turnover of medical personnel to have good, standard charting procedures and for doctors to verbally apprise successor physicians of any chronic cases. *Id.* at 65–67.

Some of Dr. Cable's testimony is more pertinent to the conduct of physicians than to medical facilities, but much of it, particularly regarding compliance with quality assurance programs and other federal guidelines, is directly applicable to CFMC. In order to be supplied with NHSC personnel CFMC entered into a Memorandum of Agreement with the NHSC, by which CFMC promised *inter alia* to develop Principles of Practice with the physicians, and to comply with NHSC regulations and policies codified at 42 C.F.R. Part 23. 42 C.F. R. Part 23 required CFMC to establish and maintain a patient record system, 42 C.F.R. § 23.8(b), and to operate a quality assurance system in accordance with 42 C.F.R. § 51c.303(c). *See* 42 C.F.R. § 23.8(f). Section 51c.303(c) in part calls for an on-going quality assurance program, including periodic assessment of services by physicians based on systematic collection and evaluation of patient records. *See* 42 C.F.R. § 51c.303(c)(2). The importance of maintaining accurate and complete medical records is stressed in the NHSC policies because of the likelihood that different physicians will treat a patient over time. NHSC Professional Policies at p. 5.

Under the Principles of Practice which CFMC developed, the staff was to review on-site services, examine samples of patient records, and follow the quality assurance plan. However, whether the existing plan was actually implemented and followed remains a disputed question of fact. The court believes that such a plan, required by NHSC regulations, is comparable to the guidelines of the Joint Commission for the Accreditation of Hospitals, and under *Blanton* non-compliance would be evidence of negligence by CFMC. 319 N.C. at 376, 354 S.E.2d at 458. Therefore, in light of Dr. Cable's testimony and the agreements between NHSC and CFMC, the court finds that whether CFMC satisfied its duties to the Plaintiffs is a question for the jury.[4]

## 2. Causation

### a. Generally

Proof of negligence is not sufficient to impose liability absent a showing that a defendant's breach of duty proximately caused the Plaintiffs' injuries. Under

---

**4.** Plaintiffs' contention that CFMC was negligent in selecting Dr. Johnson is without merit, even under a reasonable man standard. Dr. Johnson was duly licensed by the State of North Carolina when he began practicing, and the fact that he undertook an accelerated academic program is hardly evidence that he was unqualified; rather it suggests the possibility that he had unusual ability and aptitude.

North Carolina case law proximate cause is "a cause that produced the result in continuous sequence and without which it would not have occurred, and one from which any man of ordinary prudence could have foreseen that such a result was probable under all the facts as they existed." *Nance v. Parks,* 266 N.C. 206, 209, 146 S.E.2d 24, 27 (1966), *as quoted in Wall,* 310 N.C. at 201, 311 S.E.2d at 581.

■ In order to prove causation the plaintiff must introduce evidence affording "a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result." [5] *Waffen,* 799 F.2d at 918; *Fitzgerald,* 679 F.2d at 348. The burden on the plaintiff is strict; evidence raising a mere possibility that the negligence caused the injury is not sufficient, and the testimony must not be based on speculation and conjecture. *Waffen,* 799 F.2d at 917.

■ Expert testimony is usually required to show that the defendant's negligence was more likely than not the cause of the injury. *Fitzgerald,* 679 F.2d at 350. The parties essentially agree that with respect to the negligence of Drs. Hamlor and Johnson the existence of a genuine issue regarding causation depends on the testimony of Dr. Robert Ellsworth.[6]

In his deposition Dr. Ellsworth discussed numerous variable factors which can affect growth, development, diagnosis and treatment of retinoblastomas. Dr. Ellsworth also stated that when he first examined Jessica in January 1983 he believed that the chances of her retaining her eyes were thirty to forty per cent for her left and sixty to seventy per cent for her right. Ellsworth Deposition at pp. 9–10. His expectations were unfulfilled in part because Jessica's eyes developed a radiosensitivity, which is to be expected in only five to ten per cent of retinoblastoma cases. *Id.* at p.

21. However, Dr. Ellsworth also stated that the damage done because of the radiosensitivity was not sufficient to cause him to order removal of the eyes when he did. *Id.* at p. 19. Dr. Ellsworth also stated that in general tumors grow over time, and that the earlier they are detected the better. *Id.* at p. 33. Other deponents, including Dr. Littlejohn and Dr. Kerns, agreed with that position, see Littlejohn Deposition at p. 61, Kerns Deposition at p. 43.

Finally, after discussing the numerous factors which may affect a patient's care and response to treatment, and after summarizing Jessica's situation, Dr. Ellsworth concluded that, while he could not be certain, the chances that the ultimate result in Jessica's case would have been different had the retinoblastoma been diagnosed in September 1982 rather than January 1983 could have been as great as one in two, though he believed they were more likely one in three. Ellsworth Deposition at pp. 46, 77, 93. By comparison, had diagnosis and treatment begun in May 1982, Dr. Ellsworth opined that more likely than not the end result would have been different. *Id.* at pp. 63, 77, 93.

Defendants initially sought summary judgment on the claims against Dr. Johnson because he first examined Jessica in September 1982 and therefore, by Dr. Ellsworth's testimony, any negligence on Dr. Johnson's part did not proximately cause Jessica's loss of sight as a matter of law. Defendants also challenged the sufficiency of the evidence that the injury resulted from Dr. Hamlor's negligence. CFMC asserted that the numerous variables render speculative any conclusion as to causation, and pointed to Dr. Ellsworth's use of the term "educated guess" in describing his conclusions, *id.* at p. 63, as further evidence of their speculative nature.

Plaintiffs responded to these arguments by averring that their claims were based not only on the ultimate loss of Jessica's

---

5. Again, the sufficiency of the evidence to create a jury question is a matter of federal law. *Owens,* 766 F.2d at 149.

6. Defendants have produced deposition testimony by other physicians questioning the ability of anyone to draw a conclusion linking the doctors' alleged negligence to the end result, but this merely raises a genuine issue if Dr. Ellsworth's testimony to the contrary would make reasonable a jury verdict for the Plaintiffs.

eyes but also on a contention that were it not for the Defendants' negligence Jessica would have had a substantially better chance of retaining her sight. Defendants contest this claim on two bases. First, they assert that North Carolina law does not recognize a cause of action for lost possibility of recovery. Second, they oppose Plaintiffs' alleging the theory for the first time at this late stage of the proceedings, after discovery has been concluded. Plaintiffs argue in response that the theory of lost possibility was implicit in their complaint from the outset.

### b. Lost possibility

The Fourth Circuit has twice recognized a cause of action when a doctor's negligence destroyed a patient's reasonable possibility of recovery. In *Hicks v. United States*, 368 F.2d 626 (4th Cir.1966), a doctor's negligent failure to examine thoroughly a patient and perform standard tests led to an incorrect diagnosis. Because of the diagnosis the patient was released without being operated on and died shortly thereafter. The Fourth Circuit responded to defendant's contention that there was no proof of proximate causation by pointing to expert testimony that the patient would have survived if she had been operated on promptly. 368 F.2d at 632. More importantly, the court stated that the plaintiff need not show with certainty that the patient would have survived; rather, if the patient had a substantial possibility of survival, and that possibility was terminated by the defendant's negligence, the defendant is answerable. *Id.*

Recently, in *Waffen* the Fourth Circuit elaborated upon *Hicks* and "ma[d]e explicit that under the law of this circuit, and in particular of the State of Maryland, the loss of a substantial chance of survival is a cognizable harm." 799 F.2d at 917. The Fourth Circuit confirmed that the requirements for proving causation remain the same, and refused recovery to the plaintiff because she did not produce evidence that the delay in her treatment affected her chances. *Id.* at 918, 920. The court stated that mere delay and the fact that in general results are better when treatment is

begun earlier are not sufficient, *id.* at 920; however, neither must causation be proven with absolute certainty. *Id.* at 918. In short, the Fourth Circuit treated lost possibility not as a new test for causation, but as a new kind of harm. *Id.*

The availability of recovery for such harm has not been directly confronted under North Carolina law. Plaintiffs argue two cases in support and Defendants respond with cases antagonistic to the lost possibility theory. The court is not convinced that any of the decisions resolve the issue.

*Fisher v. Rogers*, 251 N.C. 610, 112 S.E. 2d 76 (1960), involved damages for injuries which might not surface until some future time, if at all. *Morrison v. Stallworth*, 73 N.C.App. 196, 326 S.E.2d 387 (1985), is more relevant, in that the plaintiff sought an additional measure of damages allegedly caused by the doctor's negligent failure to diagnose, and the resulting delay in treatment. However, the allowance of damages for shortened life expectancy, like the claim in *Fisher*, reflects a possible future loss, which is not equivalent to a lost possibility of recovery. *See Rabb v. Orkin Exterminating Co., Inc.*, 677 F.Supp. 424, 427 (D.S.C.1987) (distinguishing between chance of survival prior to malpractice and chance of incurring future disease or complication). Jessica's loss is complete; comparison with *Morrison* would be more appropriate had her cancer metastasized, reducing her life expectancy. These cases do provide limited support in that they reflect a degree of liberality by the courts in recognizing novel damage claims.

On the other hand, *Gower v. Davidian*, 212 N.C. 172, 193 S.E. 28 (1937), and *Buckner v. Wheeldon*, 225 N.C. 62, 33 S.E.2d 480 (1945), mentioned in CFMC's reply brief, are older cases in which the North Carolina Supreme Court did not consider whether lost possibility of recovery was a compensable harm. The supreme court's principal concern was the sufficiency of the evidence of causation, not recognition of a different type of harm. The same can be said for the recent state court of appeals decision in *White v. Hunsinger*. The state-

ment that proof of proximate causation requires more than a showing that different treatment would have improved the chances of recovery, *see* 88 N.C.App. at 386, 363 S.E.2d at 206, can, but need not, be construed as inconsistent with recognizing lost possibility as a compensable loss.

In the absence of significant guidance from the state courts and in light of the Fourth Circuit's receptivity to causes of action for lost possibility of recovery, the court cannot say at this time that the current status of the law is such that the North Carolina Supreme Court would reject the theory.

■■■ As to the Defendants' second contention, the language of the original complaints and of the amendments thereto, containing claims for all injuries to Jessica resulting from the doctors' negligence, can reasonably be interpreted to include reduced chances of her recovering. The court will allow the Plaintiffs to pursue the lost possibility theory.[7]

### c. Evidence of causation

■■■ Taking the evidence in the light most favorable to the Plaintiffs and allowing them all reasonable inferences therefrom, the court finds that Dr. Ellsworth's testimony raises a genuine issue regarding the causal link between the alleged negligence of Drs. Hamlor and Johnson and Plaintiffs' injuries. Dr. Ellsworth testified that more likely than not the outcome would have been different, had the retinoblastoma been diagnosed in May 1982. This testimony is an after-the-fact estimation, and cannot be compared with the prognosis he believed was accurate in January 1983. In January, Dr. Ellsworth thought Jessica's chances were good; what actually happened was the less likely, but highly possible outcome. When Dr. Ellsworth now testifies that more likely than not the outcome would have been different, he suggests that the delay more likely than not affected the results.

Dr. Ellsworth's statement that the chances of a different outcome if treatment

had begun in September 1982 were probably between one in three and one in two also suggests that Jessica's chances were reduced. Again, comparison with Dr. Ellsworth's expectations in January are inapposite; obviously he did not believe that Jessica's chances of recovery increased from September to January. Whether the decrease in her chances amounted to a substantial lost possibility is a jury question. *Waffen*, 799 F.2d at 923.

Nor can Dr. Ellsworth's testimony be dismissed as speculation and conjecture. Defendants admit Dr. Ellsworth's lofty stature in his field, and some of the experts openly deferred to his opinion. *See, e.g.,* Kerns Deposition at p. 43; *see also* Deposition of Dr. Richard Grey Weaver, Jr., at p. 69. Dr. Ellsworth also had the benefit of examining Jessica's eyes in January 1983 and throughout the course of her treatment, and therefore has perhaps the most solid basis for rendering an opinion. The mere usage of the term "guess" is not conclusive. *See Wesley v. Greyhound Lines, Inc.,* 47 N.C.App. 680, 688, 268 S.E. 2d 855, 861, *disc. rev. denied,* 301 N.C. 239, 283 S.E.2d 136 (1980). Plaintiffs are not required to show that the outcome certainly would have been different without the Defendants' negligence. *Waffen*, 799 F.2d at 918; *Hicks*, 368 F.2d at 632. Lastly, Dr. Ellsworth did not seem to be simply relying on the "magic words." Allowing the reasonable inferences, *see Largent v. Acuff,* 69 N.C.App. 439, 443, 317 S.E.2d 111, 113, *disc. rev. denied,* 312 N.C. 83, 321 S.E.2d 896 (1984) (court drew inference from expert's testimony despite his use of conditional terms, *e.g.,* "quite likely" and "may"), the court does not conclude that his opinion was inconsistent with his prior discussion of the variables. The weight to be given divergent expert opinions is for the jury.

With respect to the independent negligence claims against CFMC, an issue exists as to whether proper review procedures

---

**7.** The court does not determine at this time what amount of damages might be recoverable for lost possibility of recovery, compared with the ultimate loss of Jessica's eyes.

and a quality assurance plan would have allayed the effects of the doctors' conduct.

## B. Respondeat Superior

CFMC seeks summary judgment on Plaintiffs' claims which attempt to hold CFMC liable for the doctors' negligence. CFMC asserts that Dr. Hamlor was employed by the NHSC and was not CFMC's "agent." CFMC also contends that Dr. Johnson, who chose the private practice option offered by the NHSC, was an independent contractor whose actions cannot be attributed to the clinic.

■ The rule of *respondeat superior* holds an employer, including a medical facility, liable for the acts of its agents committed in the course ·and scope of their employment. *Bost v. Riley,* 44 N.C.App. 638, 645, 262 S.E.2d 391, 395, *disc. rev. denied,* 300 N.C. 194, 269 S.E.2d 621 (1980) (citing *Waynick v. Reardon,* 236 N.C. 116, 72 S.E.2d 4 [1952]). Any negligence by Dr. Hamlor or Dr. Johnson obviously occurred during the course of Jessica's care at CFMC. Therefore, the question is whether the doctors were CFMC's agents. For the purpose of imposing vicarious liability, whether the requisite agency relationship existed depends on the degree of control CFMC exercised over the doctors' activities. *Vaughn v. North Carolina Dept. of Human Resources,* 296 N.C. 683, 686, 252 S.E.2d 792, 795 (1979); *Willoughby v. Wilkins,* 65 N.C.App. 626, 633–34, 310 S.E.2d 90, 95 (1983), *disc. rev. denied,* 310 N.C. 631, 315 S.E.2d 697 (1984).

### 1. Agency of Dr. Johnson

■ The nature of the relationship between CFMC and Dr. Johnson remains in dispute. The written "Agreement to Provide Professional Services" ("Agreement") which the two entered into calls Dr. Johnson an independent contractor, *see* Section 2, but this is not conclusive under North Carolina law. *See Willoughby,* 65 N.C. App. at 635, 310 S.E.2d at 96 (quoting *Ford v. Willys–Overland,* 197 N.C. 147, 149, 147 S.E. 822, 823 [1929]) ("when the provisions of the contract make it a contract of agency, then it is a contract of agency, and it

makes no difference by what names the parties call themselves"). The contract also provided that Dr. Johnson would work normal hours and exercise independent judgment. Agreement, Section 8.

On the other hand, Section 8 also restricts Dr. Johnson to working for CFMC. In addition, CFMC was to pay his compensation, *id.,* Section 14, including vacation and continuing medical education, *id.,* Section 19, his disability, *id.,* Section 18, and even some of his moving expenses. *Id.,* Section 20. Finally, the contract included a non-competition clause. *Id.,* Section 24.

In *Rucker v. High Point Memorial Hospital, Inc.,* 20 N.C.App. 650, 202 S.E.2d 610, *aff'd,* 285 N.C. 519, 206 S.E.2d 196 (1974), the state court of appeals found the requisite agency relationship when the doctor's contract required him to work set hours, made provisions for vacation and sick leave, and limited him to practicing at that hospital. *See also Willoughby,* 65 N.C.App. at 634–35, 310 S.E.2d at 96 (prohibiting private practice and controlling doctor's schedule, including vacation, were factors contributing to finding of agency); *cf. Smock v. Brantley,* 76 N.C.App. 73, 331 S.E.2d 714 (1985), *disc. rev. denied,* 315 N.C. 590, 341 S.E.2d 30 (1986) (resident assigned to facility by medical school and who was not subject to hospital's rules and regulations was not an employee).

■ Even disregarding for the moment the disagreement between CFMC administrator Stephen Shore and Dr. Johnson about whether Dr. Johnson's contract required him to make public appearances and to entertain on behalf of CFMC, the remaining provisions of his professional contract certainly raise some question under North Carolina law about whether he was an independent contractor or an employee. Therefore, summary judgment for CFMC as to the claims against Dr. Johnson (for which summary judgment has been discussed and denied above) is also denied.

### 2. Agency of Dr. Hamlor

■ In contrast, the record supports CFMC's position that Dr. Hamlor was an

employee of NHSC, and was not CFMC's agent. Applying the "extent of control" standard, Dr. Hamlor's situation is substantially different because he did not elect the private practice option in fulfilling his commitment to NHSC.[8] Rather, according to the deposition testimony of Jesann Hendrix, the head of the NHSC, and the Memorandum of Agreement ("MOA") and Principles of Practice involving Dr. Hamlor, he remained an employee of the NHSC.

Moreover, CFMC did not exercise any significant degree of control over Dr. Hamlor other than the general guidelines and procedures to be followed at the clinic which were outlined in the Principles of Practice between Dr. Hamlor and CFMC. Pursuant to the Memorandum of Agreement between the NHSC and CFMC, the NHSC paid Dr. Hamlor's salary and relocation expenses, as well as for continuing medical education and defending malpractice claims. The NHSC professional policies do make the doctors accountable for their activities to the project office (CFMC) as well as to the regional NHSC office, NHSC Policies at p. 3, and CFMC did have some control over Dr. Hamlor's daily schedule. This minor administrative accountability is secondary to the express provisions in the Memorandum of Agreement that NHSC doctors are under the direct supervision and control of the United States, and their observance of the local rules is incidental to their federal performance. MOA Section II.B.

■ In short, the only control CFMC exerted over Dr. Hamlor was administrative, *e.g.*, the day-to-day scheduling and billing of patients, and CFMC was required to reimburse NHSC for Dr. Hamlor's time. CFMC's responsibility as a health center was to supervise its medical personnel and operations in terms of care and administra-

tion. It did not directly control the government physicians beyond the general terms of the Principles of Practice. Because of its lack of legal control over Dr. Hamlor, CFMC should not be held vicariously responsible for his negligence and its motion for summary judgment on this claim is granted.[9]

## II. *Judgment on the Pleadings*

The United States has also filed a motion for judgment on the pleadings. Even assuming that the motion was timely, in light of the court's findings that substantial factual issues remain regarding Dr. Hamlor's negligence, and that the lost possibility theory was sufficiently pled, the motion must be denied. *See generally* C. Wright & A. Miller, *Federal Practice and Procedure* §§ 1367, 1368 (and cases cited therein).

## SUMMARY

In response to Defendant CFMC's request in its brief that the court clarify the remaining issues for trial, the court will summarize today's ruling. The court finds sufficient evidence in the record to raise genuine issues about Dr. Hamlor's and Dr. Johnson's breach of the standard of care, and the connection between such alleged breaches and the injuries suffered by Plaintiffs. That harm may include both the ultimate loss of Jessica's eyesight and the lost possibility of recovery she may have suffered due to the allegedly negligent delay in diagnosis and treatment. The court also finds that the "Agreement to Provide Professional Services" and testimony regarding Dr. Johnson's role at CFMC raise the issue of Dr. Johnson's status as an agent of CFMC, and CFMC's vicarious liability for his negligence. Finally, the court finds just enough evidence of the standard

---

**8.** The private practice option elected by Dr. Johnson apparently was not available at the time Dr. Hamlor began fulfilling his commitment. *See* Hendrix Deposition at p. 46.

**9.** In light of CFMC's lack of control the loaned servant theory argued by Plaintiffs is not applicable. *See Jackson v. Joyner*, 236 N.C. 259, 261, 72 S.E.2d 589, 591 (1952). Nor does the holding in *Cahill v. HCA Management Co.*, 812 F.2d 170

(4th Cir.1987), help Plaintiffs' case because HCA was the management company for the hospital, and had been granted full supervisory authority (albeit absent the trustees' disapproval) including the power to hire and fire personnel. As such, extending liability to both the hospital and HCA is plainly different from holding CFMC, which did not have such substantial authority, responsible in this case.

or standards of care applicable to CFMC, breach of those standards, and causation from such breach to make summary judgment on Plaintiffs' claims of independent negligence by CFMC inappropriate.

The court finds that the documentary and deposition evidence concerning Dr. Hamlor's relationship with CFMC would not allow a jury reasonably to find that CFMC exerted control sufficient to render Dr. Hamlor its agent. Accordingly, summary judgment is granted to CFMC on the claims asserting CFMC's vicarious liability for Dr. Hamlor's negligence. The court also finds no basis for Plaintiffs' claim that CFMC was negligent in hiring and holding out Dr. Johnson as qualified, and summary judgment is granted on that claim as well.

An order and judgment consistent with this memorandum opinion shall be entered contemporaneously herewith.

### ORDER AND JUDGMENT

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that motion of Defendant and Third–Party Defendant Caswell Family Medical Center, Inc., for summary judgment is GRANTED in part and DENIED in part as follows: As to Plaintiffs' claims seeking relief against Caswell Family Medical Center, Inc., on the basis of its vicarious liability for the alleged negligence of Dr. Gahear Hamlor and as to Plaintiffs' claims seeking relief for Caswell Family Medical Center, Inc.'s independent negligence in hiring and holding out Defendant Dr. David Johnson as qualified, Defendant's motion for summary judgment is GRANTED and such claims are hereby DISMISSED with prejudice; as to all remaining claims of Plaintiffs against Caswell Family Medical Center, Inc., Defendant's motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that the motion of Defendant Dr. David Johnson for summary judgment is DENIED.

IT IS FURTHER ORDERED that the motion of Defendant the United States of America for summary judgment is DENIED; and

IT IS FURTHER ORDERED that the motion of Defendant the United States of America for judgment on the pleadings is DENIED.