**Decided November 13, 1987**

IN THE DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

DAVID GOWER,                          )     CIVIL ACTION NO. 82:0054
                                      )
        Plaintiff,                    )
                                      )     FINDINGS OF FACT AND
        vs.                           )     CONCLUSIONS OF LAW
                                      )
COMMONWEALTH OF THE                   )
NORTHERN MARIANA ISLANDS,             )
                                      )
        Defendant.                    )
_____)

FINDINGS OF FACT

1.  On March 30, 1981, at approximately 8:00 p.m., plaintiff David E. Gower was walking along Chalan Pale Arnold, "Middle Road", when he was struck by a car.

2.  The impact of the collision dislocated his left knee, which then immediately snapped back into place.

3.  Gower was discovered lying on the road by his wife. She summoned police and an ambulance, which transported Gower to Dr. Torres Hospital.

4.  Dr. Torres was the hospital facility for Saipan at that time. It was operated by the defendant Commonwealth of the Northern Mariana Islands (CNMI). Dr. Long (M.D., a United States medical doctor) and Dr. Kaipat (M.O., a medical officer trained in Fiji) were the treating and examining

212

physicians at Dr. Torres Hospital at all relevant times in question.

5. The lower leg is comprised of four enclosed fascial compartments which contain muscles, nerves and vessels. Compartment Syndrome is a condition which is caused by, among other things, a blunt trauma to the leg, which results in the compartments of the extremity filling with blood or tissue fluid. The build-up of the fluid increases the pressure within the compartment, resulting in a diminished blood supply flowing into the compartment. The effect of this, initially, is tissue ischemia (lack of oxygen) and the condition can progress to anoxia (absence of oxygen) if not timely treated. The decrease in or absence of oxygen in the extremity results in cell and tissue death.

6. The onset of Compartment Syndrome, if it occurs, normally takes place within six to eight hours after a traumatic injury.

7. The critical period following the onset of Compartment Syndrome is 6 to 12 hours, after which permanent damage from cell and tissue death is irreversible.

8. The symptoms of Compartment Syndrome in descending order of their importance in determing its existence are:

    1. Pain out of line with the injury;

    2. Pallor;

    3. Lack of pulse or diminished pulse in extremity distal to injury;

**213**

4. Parastesias;

5. Paralysis;

6. Tension in compartments;

7. Pain on passive stretching; and

8. Lack of warmth.

These signs are progressive and do not cease with the passage of time.

9. Gower arrived at Dr. Torres Hospital at approximately 10:30 p.m. on March 30, and was treated by Dr. Long.

10. Dr. Long's examination indicated that Gower had good distal pulses, his reflexes were normal, and he had normal sensation in his left leg.

11. Dr. Long's examination revealed that Gower had large bruises on the upper part of his body, a large laceration on the right leg, and large bruises on the left thigh and knee.

12. Gower's right knee was sutured and his upper legs were x-rayed. Gower was administered morphine per Dr. Long's order and was admitted to the ward at Dr. Torres Hospital at 12:30 a.m. on March 31, 1981. His wife accompanied him.

13. Gower experienced severe pain during the early morning hours of March 31, 1981. He and his wife requested that the attendant nurse provide him with pain killer. The nurse contacted Dr. Long at 4:00 a.m. and informed him of Gower's condition. Dr. Long prescribed Demerol to relieve the pain.

14. Compartment Syndrome was apparent in Gower's left leg in the morning of March 31 when Gower began to have the symptom

**214**

complex of increasing pain, swelling, and decreasing neurologic and vascular function. (Report of Dr. Mantica, Defendant's expert, Plaintiff's Exhibit 3. Deposition of Dr. Gamble, Plaintiff's expert, p. 53.)

15. Dr. Long examined Gower at 7:30 a.m. on the morning of March 31, 1981. The examination revealed that Gower was suffering from extreme pain in his lower left leg. Dr. Long was familiar with the clinical symptoms of Compartment Syndrome and was familiar with the non-instrument tests and observations used to determine its presence. However, Dr. Long did not conduct an examination for Compartment Syndrome at 7:30 a.m. despite the existence of excruciating pain (the single most telling factor of the condition) in the left knee, which he noted in the medical charts.

16. Dr. Long prescribed morphine for pain and referred Gower to Dr. Kaipat who conducted an examination on Gower at 9:00 a.m. that same morning.

17. Dr. Kaipat is a medical officer who serves on the medical staff at Dr. Torres Hospital. In 1981, he was the Chief of the Orthopedic Surgical Staff at Dr. Torres.

18. Dr. Kaipat's examination revealed that Gower was suffering from extreme pain in his left knee and he determined that Gower should be medivaced to Guam because of what Dr. Kaipat diagnosed as a possible kidney injury and ligament damage in Gower's left knee.

19. Dr. Kaipat was familiar with the signs and symptoms of

Compartment Syndrome and the instrument and non-instrument methods used to determine its presence.

20. Dr. Kaipat failed to perform the indicated tests for Compartment Syndrome despite noting that Gower was suffering from severe pain in his leg, its most telling sign.

21. The diagnosis of Compartment Syndrome was not made by Dr. Long or Dr. Kaipat. (Report of Dr. Mantica, Plaintiff's Exhibit 3.) Nor did - either doctor diagnose Gower's dislocated knee. (Transcript of Dr. Gamble.)

22. Dr. Kaipat testified that he performed the tests for Compartment Syndrome, at 9:00 a.m. and again at 1:30 p.m. and that the results were negative. The hospital records he made contemporaneously and subsequent to his examinations do not indicate that these tests were performed. Dr. Kaipat explained this apparent discrepancy as being due to the fact that he does not record negative findings. This same report, however, does include negative findings documented by Dr. Kaipat during the same examination. The report of defendant's expert Dr. Mantica indicates that Compartment Syndrome was apparent in the morning of March 31. This is consistent with the evidence from plaintiff's expert Dr. Gamble. It is also consistent with the other evidence admitted at trial which showed that Gower was suffering from extreme pain beginning in the early morning of March 31, and the records from Naval Hospital and Guam Memorial Hospital which show that Gower had a full blown Compartment Syndrome

**216**

that afternoon requiring the removal of his fibula to reduce the pressure that had built up over the preceding hours. The Court finds, based upon the totality of the evidence admitted at trial and its assessment of the credibility of the witnesses, that tests for Compartment Syndrome were not performed while Gower was at Dr. Torres Hospital.

23. At approximately 9:30 a.m. on the morning of the 31st, Dr. Kaipat ordered that Gower's leg be splinted and that Gower be medivaced to Guam.

24. Gower was splinted 4 hours later (1:30 p.m. that afternoon) and medivaced to Guam on a 3:00 p.m. Continental Airlines flight.

25. According to the uncontradicted testimony of Hospital Administrator Greg Calvo, Gower was not medivaced on the first commercial flight following Dr. Kaipat's order. Calvo also indicated that it was the medical staff's responsibility to insure that Gower was transferred in a timely fashion.

26. Dr. Kaipat disagreed and stated it was the Hospital Administrator's function to medivac patients in a timely manner. It is apparent from the testimony that the hospital had no coherent, efficient policy regarding emergency evacuation to off-island medical facilities.

27. Nurse Likiak Monkeya testified that he observed Dr. Kaipat perform the tests on Gower for Compartment Syndrome at 1:30 p.m. on the afternoon of the 31st. According to Monkeya,

**217**

Gower only exhibited pain and that two other signs, capillary filling and circulation, were negative. There is no documentation of this examination, in fact, the absence of such documentation persuades the Court that such examination never took place. Furthermore, the physicians agreed that the signs and symptoms of Compartment Syndrome do not come and go. It has been established that the Compartment Syndrome was present in the early morning of March 31. It was evident on Guam at 4:30 p.m. when Gower arrived at the Naval Hospital and, therefore, it was impossible for Monkeya's testimony to be true. For these reasons, Nurse Monkeya's testimony is determined to be unreliable.

28. Had Dr. Kaipat or Dr. Long recognized Compartment Syndrome earlier, the treatment for Compartment Syndrome ---initially early splinting--- at Dr. Torres Hospital could have been accomplished. (Report of Dr. Mantica, Plaintiff's Exhibit 3.)

29. Earlier diagnosis and treatment of Compartment Syndrome would have resulted in Gower's injury being less severe.

30. According to Dr. Kaipat, the treatment for Compartment Syndrome is immediate evacuation and surgery.

31. Gower was met at 4:00 p.m. at the Guam International Airport by an ambulance and was transported to Naval Hospital.

32. The examination at the Naval Hospital revealed that Gower exhibited the following symptoms:

**218**

1. Severe pain in left leg;

2. Tenderness;

3. No pulse in his foot; and

4. No sensation between the great and little toe.

33. Gower was transferred from Naval Hospital to Guam Memorial Hospital where a fibulectomy was performed to reduce the pressure in his leg.

34. Gower has submitted medical bills substantiating $46,783.83 in costs directly related to his treatment for Compartment Syndrome.

35. As a result of Gower's Compartment Syndrome and the fibulectomy that followed he has an abnormal gait, his leg is permanently deformed, he suffers and will continue to suffer pain. His leg for all practical purposes is a living prosthesis.

36. In addition, this Court finds that his injury has resulted in past pain and suffering and will result in future pain and suffering. Gower has also lost his job, partially as a result of this injury. The combination of all these factors has contributed to emotional, mental, and family problems which will more probably than not be with Gower for some time to come.

## CONCLUSIONS OF LAW

1. Jurisdiction is based on Article IV, §2, of the CNMI

**219**

Constitution and 48 U.S.C. §1694a(b).

2. Negligence is a breach of a duty owed to another which breach proximately results in an injury and is the cause in fact of an injury to one for which the duty was owed.

3. Standard of Care. Both Dr. Long and Dr. Kaipat expressed their familiarity with the causes of Compartment Syndrome and the clinical, non-instrument tests (e.g. recognition of pain out of line with injury, pain on passive stretching, absence of pulse in extremity, pallor, lack of warmth) used to discover its presence. Further, it is uncontested that it is standard practice to test for Compartment Syndrome in a situation as this where a patient suffers a blunt trauma to an extremity and exhibits pain out of line with that injury several hours later. The standard of medical care in this community has been established not only by the experts on both sides but also by the physician accused of malpractice and that standard is to perform the indicated tests in a situation like the one presented herein. Hicks v. United States, 368 F.2d 626, 630 (4th Cir. 1966), Vigil v. Herman, 102 Ariz. 31, 424 P.2d 159, 162 (1967).

4. Failure to perform these tests constitutes a breach of that standard of care.

5. Dr. Long breached that duty when, after having prescribed Demerol at 4:00 a.m. to alleviate Gower's pain and recognizing excruciating pain in Gower's leg at 7:30, he failed to conduct the simple tests that would have revealed

**220**

Gower's impending Compartment Syndrome.

6. Dr. Kaipat, the CNMI's orthopedic specialist, also breached his duty to Gower when he failed to test Gower for Compartment Syndrome.

7. To prevail in an action for negligence, plaintiff must demonstrate that defendant's failure to conform to the applicable standard of care was the proximate cause and the cause in fact of plaintiff's injury. This test has been articulated by some experts as the "but for" test. See, e.g., Prosser and Keeton, Prosser And Keeton On Torts, 5th Edit. 1984, p.265.

8. Dr. Long's failure to diagnose Gower's dislocated knee resulted in a delay in ordering the leg to be splinted which compounded Gower's injuries.

9. Dr. Long's failure to conduct the test for Compartment Syndrome at 7:30 a.m. on March 31, was a cause in fact of Gower not being medivaced at an earlier time.

10. Dr. Kaipat's failure to conduct the tests at 9:00 a.m. was a cause-in-fact of Gower's injuries because it resulted in a delay in Gower being medivaced.

11. The failure of the hospital staff to splint Gower's leg within a reasonable time following the doctor's order to do so contributed to Gower's permanent disability.

12. The standard of care for treating a Compartment Syndrome is immediate evacuation and surgery. Text of Dr. Kaipat, p. 38, see Vigil v. Herman, 424 P.2d at 162.

13. The failure of the hospital staff, whether medical or administrative, to promptly medivac Gower following the doctor's order to do so contributed to Gower's injuries. Defendant contends that medivacing is a discretionary decision and the government cannot be held liable for negligence involving discretionary decisions. The Court chooses not to rule on whether the decision to medivac is discretionary because it does not need to. Dr. Kaipat testified that the presence of Compartment Syndrome necessitated immediate evacuation. It was his and Dr. Long's failure to conduct the proper tests which precluded this diagnosis and subsequent immediate evacuation. Despite this oversight, at 9:00 a.m. Dr. Kaipat ordered Gower to be medivaced. However, he was not medivaced for seven hours even though commercial air service was available in the interim. Even if this Court were to accept defendant's argument that the decision to medivac was discretionary, negligence in medivacing Gower occurred at the operational stage - the carrying out of Dr. Kaipat's decision to medivac Gower. The staff at Dr. Torres is not clothed with immunity for negligence because the initial decision may have been discretionary. Once the decision is made, there is a duty to proceed with due care. Indian Towing Company v. United States, 350 U.S. 61, 69 (1955).

14. The failures of the medical, hospital and administrative staffs were the cause-in-fact and the proximate cause of

Gower's injuries subsequent to the initial impact of his being hit by a car. But for their actions and inactions, Gower would not have suffered the permanent disability he now suffers.

15. As a result of Compartment Syndrome Gower has been damaged in the amount of $46,783.83 (medical bills). The Court deems that Gower's past pain and suffering requires $50,000 compensation. Gower's future pain and suffering including mental anguish for the permanent deformity to his leg and the permanent loss of mobility is $50,000. Gower is also awarded $10,000 for future medical care which will be required to attempt to improve his condition. The damages Gower has suffered exceed $100,000 but this Court is limited by 7 CMC § 2202(a) to that amount, which is hereby awarded to Gower.

DATED this 13ᵀᴴ day of November, 1987.