## CIRCUIT COURT OF FAIRFAX COUNTY

Ann P. George

v.

Kaiser Foundation Health et al.

March 3, 1989

Case No. (Law) 79507

By JUDGE THOMAS A. FORTKORT

A. *Statement of Facts.*

In October, 1985, Ann Price George sought consultation with Dr. Joanna Cavender, a physician in the employ of Kaiser Georgetown, a health maintenance organization, concerning the condition of the nipple in her left breast. Dr. Cavender palpated a mass in Mrs. George's breast. The standard of care required that Mrs. George be referred to a surgeon for a biopsy to determine if the mass was cancerous. There was conflicting evidence as to whether Dr. Cavender performed this duty. Mrs. George was seen approximately six months later by a Dr. McKelway who referred her to a surgeon for a biopsy. She delayed in seeing the surgeon until September. She ultimately underwent surgery for removal of her left breast and shortly thereafter for removal of the right breast. Mrs. George died of cancer in January, 1989, three months after the conclusion of the trial in her case.

B. *Summary of Post Trial Motions.*

Defendants have set forth five basic grounds as assignments of error upon which the post-trial motions are made. I have concluded that none of these arguments has sufficient merit to justify setting aside the verdict.

The Defendants' arguments are as follows: (1) that the verdict was contrary to the weight of the evidence since Plaintiff's experts failed to prove to a reasonable medical certainty that Defendants' alleged negligence was the proximate cause of the ultimate damages suffered by Mrs. George (i.e., that any delay in diagnosis made any difference in her ultimate prognosis); (2) that the trial court erred in granting an instruction on abandonment as Defendants claim that term is used and understood in its ordinary meaning; (3) that the trial court erred in allowing Plaintiff's expert, Dr. Hammock, to testify to matters not previously disclosed in discovery (specifically, his changed position on the standard of care); (4) that the trial court erred in excluding the advisory opinion of the medical malpractice review panel because it was not an exact choice of the opinions offered under Section 8.01-581.7; and (5) that the verdict ignores the evidence of contributory negligence and the large award was not proportionately reduced for the harm Plaintiff herself could have avoided.

C. *The Malpractice of the Defendant Did Not Destroy the Plaintiff's Substantial Possibility of Survival.*

Defendants contend that Plaintiff's experts failed to prove the causation element to a degree of reasonable medical certainty. Ideally, such a determination of whether Plaintiff has met such a burden belongs to the jury alone, and the judge should not disturb the finding unless plainly wrong. *See Lane v. Scott*, 220 Va. 578, 260 S.E.2d 239 (1979).

The jury finding allows us to presume that medical malpractice has been found against the defendants. While the issue was sharply disputed, there is sufficient evidence to support this portion of the jury verdict.

1. *Causation.*

Once liability is established, the question arises as to whether there is evidence that the malpractice was a proximate cause of the plaintiff's injury. On her first examination by Dr. Cavender, the medical experts agree that Mrs. George already was afflicted with breast cancer.

In his memorandum to set aside the plaintiff's jury verdict, the defendant refers to this issue as "the causation issue in this matter was whether any delay in diagnosis, either by patient or physician, made any difference in Mrs. George's ultimate treatment, her prognosis, or the harm she allegedly suffered." (Memorandum of Law in Support of Defendant's Motion to Set Aside the Verdict. (p. 5). This precept is generally referred to as the *Hicks* rule from the case of *Hicks v. United States*, 368 F.2d 626 (4th Cir. 1966), which rule was adopted by the Virginia Supreme Court's ruling in *Brown v. Koulizakis*, 229 Va. 524, 331 S.E.2d 440 (1985).

2. *The Quantum of Proof.*

There is no dispute between the parties as to what rule controls causation in medical malpractice cases. Defendant's complaint is not with the rule but rather what quantum of proof is required to make causation a jury question. In his reply brief, the defendant states the problem in these terms "the evidence may have shown that it was *possible* under some circumstances that a failure to refer someone to a surgeon might cause some harm, but neither Dr. Barr nor Dr. Hammock's testimony showed that it was *reasonably probable or more probable than not* that the alleged failure caused the plaintiff in the instant matter any harm." (Defendant's Reply Brief, p. 4).

There are several cases which deal with the issue of the quantum of proof. In the Pennsylvania case of *Jones v. MonteFiore Hospital* at 431 A.2d 920 at 924, the Pennsylvania Court stated the rule as:

> medical opinion need only demonstrate with a
> reasonable degree of medical certainty that
> a defendant's conduct increased the risk of

harm actually sustained and the jury then must decide whether that conduct was a substantial factor in bringing about the harm.

3. *Probability that the Harm Resulted from the Negligent Act is a Jury Question.*

Again in Pennsylvania in the case of *Gradel v. Inouye*, 421 A.2d 674 at 679, the Court states the rule as follows:

accordingly medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk that the harm sustained by the plaintiff would occur.

The jury, not the medical expert, then has the duty to balance probabilities and decide whether the defendants' negligence was a substantial factor in bringing about the harm. The *Gradel* case quoted above deals with the diagnosis and treatment of breast cancer.

In the New Jersey case of *Evers v. Dolinger*, 471 A.2d 405 (N.J. 1984), the New Jersey Court found the Pennsylvania ruling persuasive. The *Evers* Court considered the detection and treatment of a mass which ultimately turned out to be cancerous. There are other cases which follow the same rule, all of which have their genesis in the Restatement of Torts. (Restatement (2d) of Torts, Sec. 323 (1965)). In the Restatement, once liability has been determined, it becomes a jury question as to whether causation exists, and the medical care provider may be liable if "his failure to exercise such care increases the risk of such harm." This particular section of the Restatement of Torts is generally construed to relax the degree of certainty ordinarily required of a plaintiff's evidence on the issue of causation.

Indeed, in Medical Malpractice, 2d ed. Michie, Para. 22.2, the author makes the case that the quantum of proof should be less in malpractice cases than in ordinary personal injury lawsuits. To that proposition he cites the California case of *Isaacs v. Huntington Memorial Hospital*, 695 P.2d 653 (1985), which holds that causation should always be a question of fact. The author also

offers the Supreme Court of the United States case of *Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107 (1959). Quoting from that case, the Supreme Court states:

> the matter does not turn on the use of a particular form of words by the physicians in giving their testimony. The members of the jury not the medical witnesses are sworn to make a legal determination of the question of causation. They are entitled to take all the circumstances including the medical testimony into consideration.

The general rule then followed in these cases is that once liability is established against the health care provider, it is for the jury to determine whether that negligence was a cause of the plaintiff's ultimate harm or increased risk. None of these cases would hold the plaintiff to a standard advocated by the defendant in the instant case, that is that the plaintiff must show causation was reasonably probable or more probable than not.

4. *Probability is Not Measured by a Greater or Lesser Than 50% Standard.*

In fact, the question of probabilities was rejected by the Court in *West v. Atkins*, 799 F.2d 923 (4th Cir. 1986). On page 922 of that opinion, the Court states:

> on the other hand the chance of survival need not have been 51% or more before it was reduced. It is true that several courts have held that the probability of survival had to be more than 50% in order for liability to be present. Recovery is denied unless the plaintiff can establish that the decedent would probably have survived but for the defendant's negligence . . . the rationale is that the defendant should not be liable where the decedent more likely would have died in any event. The Courts that take this position do so on the basis that the principle of proximate cause requires the harshness

of the result. We believe that such analysis confuses proximate causation and proof of harm, while inter related, they cannot be merged into each other. As discussed above, the standard for proof of causation in this circuit after *Hicks* remains unchanged. It is one of proof by a preponderance of evidence, but that which is being proved be proximately related to the defendant's negligence is the legal harm of loss of a substantial possibility. There is nothing in the language of *Hicks* which requires substantial to mean 51% as opposed to 49%, to decide otherwise would be a blanket release from liability for doctors and hospitals at any time there was less than a 50% chance of survival regardless of how flagrant the negligence . . . the better role, we believe is that once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, it becomes a question for the fact finder to determine whether the increased risk amounted to a loss of a substantial possibility of survival.

### 5. *Some Courts which Reject the Hicks Doctrine.*

A look at one of the cases which does not follow the *Hicks* doctrine is instructive. The New Hampshire Court in the case of *Pillsbury-Flood v. Portsmouth Hospital* at 512 A.2d 1126 (N.H. 1986), rejected the *Hicks* doctrine. In that opinion, the Court, first defines the New Hampshire ruling on causation in torts as "negligent conduct is a proximate or legal cause of harm if the actor's conduct is a substantial factor in bringing about the harm." The Court goes on to premise its decision against the plaintiff in this case on the basis that use of the *Hicks* rule would shift the burden of causation from the plaintiff to the defendant. What is curious in this decision is that the New Hampshire general definition of proximate cause is closer to the *Hicks* formulation than the older definition used by Virginia and other courts that a proximate cause

is a cause which in natural and continuous sequence produces the injury.

The New Hampshire court finds causation to be a question of probability:

> additionally we conclude that the Hicks Rule which allows the trial court to relax the causation requirement and submit the issues to the jury if the defendants' negligence increase the risk of harm is ill advised. Causation is a matter of probability not possibility. *Pillsbury-Flood*, p. 1130.

6. *The Hicks Rule Supports Rather Than Relaxes General Causation Theory.*

Rather than relaxing the traditional rules of causation, the *Hicks* finding supports the original rule. To demonstrate this aspect, assume that a person with a pre-existing back injury is disabled as a result of the defendant's negligence in an automobile accident. When the plaintiff puts on his proof, he is only required to show that his injuries were increased as a result of the defendant's negligence. He is not required to show through his expert witness that the disability of which he now complains was more than probably caused as a result of the trauma rather than the pre-existing injury. In other words, his quantum of proof is merely to show increased injury. The defendant may produce evidence that the person probably would have become disabled in a period of time due to his pre-existing injury, but the court does not place upon the plaintiff the burden to show that the new injury more probably caused the disability than not. The trier of fact will determine if the accident was a proximate cause of the injury and will be instructed to disregard in its award any damages resulting from the pre-existing injury.

In a medical malpractice case, where the plaintiff with the disease comes to a physician, he is in the same position as the plaintiff with a pre-existing injury. When the doctor fails to meet the standard of care and the patient establishes that fact, it should be up to the trier of fact to what portion of his injury was caused

by the pre-existing problem and what portion of his injury, if any, was caused by the doctor's negligence.

The standard sought to be used in lieu of the *Hicks* rule forces the plaintiff to demonstrate the defendant's negligence more *probably than not* was a proximate cause of his injuries. It is precisely the argument rejected by a majority of courts who measure causation by allowing proof of "a proximate cause" rather than "*the* proximate cause of an injury."

Courts throughout the nation in numerous opinions agree with the definition of proximate cause rendered by the United States Eighth Circuit Court of Appeals in *Smith v Am. Guild of Variety Artists*, 349 F.2d 975 at 980 (8th Cir. 1965).

> To render a defendant liable for contractual interference4 it is not necessary that action of defendant be the sole or primary cause of plaintiff's damage but only that it is a substantial cause.

The language used by the Eighth Circuit parallels the language of the New Hampshire rule but achieves the opposite result. The assertion by the New Hampshire Court that causation is "a matter of probability" is clearly misplaced. The vast majority of American courts simply do not support that view of causation. In short, despite some commentary that it relaxes the rule on causation, the *Hicks* rule is a rational exposition of current tort doctrine. The application of that rule to the case at bar excludes defendant's contention that the Plaintiff must show the negligence of the doctor more probably than not caused her harm. When that hypothesis is removed, the evidence of causation is sufficient to support the jury verdict.

### D. *The Jury Instruction on Abandonment Was Improper.*

Defendants have also argued that an instruction using the term "abandonment" of the patient was improper based on the ordinary meaning/usage of that word in law and was highly prejudicial to the Defendants. They claim the legal meaning of abandon is the intentional and affirma-

tive severance of a physician/patient relationship at a time when the patient continues to require medical treatment. Defendants cite the annotation at 57 A.L.R. 2d 435, Sec. 1(d) (1958) to support their argument. However, the annotation notes that the definition is used for the purposes of the annotation only and concedes it is frequently used in a broader sense to include instances of the physician's failure to give proper medical treatment to the patient and could be used to describe negligent action of the physician where the physician did not intend to terminate the relationship. (This definition is used by Plaintiff in this case.)

In a Virginia case where abandonment was at issue, *Vann v. Harden*, 187 Va. 555 (1948), the doctor was *not* found to have intentionally withdrawn from the patient's care but failed to adequately provide for substitute care when he was away and for ignoring requests from the patient to recheck the wound.

The issue in the case at bar was whether Defendant Cavender took no further action to notify Mrs. George or to arrange for further treatment by another doctor when she knew or should have known Mrs. George continued to require treatment. Whether Dr. Cavender believed her job was completed or not, the fact that services were not rendered as long as necessary is the focus of this "duration of duty" instruction.

The exact instruction in question is as follows:

> The doctor or other health care provider who has accepted a patient for treatment has a duty to continue providing services as long as they are necessary. A doctor or other health care provider may not abandon the patient while services are necessary unless the doctor or other health care provider gives notice to the patient, makes arrangements for continuing treatment by another doctor. If the doctor or health care provider fails to perform his duty, then the doctor or health care provider is negligent. (Instructions, Tr. 55).

Defendants argue that Plaintiff's pleadings as well as her evidence does not advance the idea that she was

abandoned, given Defendants' contention that abandon means to completely reject one's responsibilities. However, Plaintiff's pleadings do allege violations of the standard of care and specifically allege the Defendants had a duty to properly treat or advise Plaintiff to obtain treatment, and to properly notify of evaluation, diagnosis or prognosis. Such allegations are consistent with the above instruction to the extent that it states there is a duty to continue treatment as long as necessary or to make arrangements for continuing treatment. The motion to set aside on these grounds is denied.

### E. *Dr. Hammock's Testimony Was Improperly Admitted.*

Defendants argue Dr. Hammock's testimony at trial as to the violations of the standard of care exceeded the testimony given in discovery and was not previously disclosed to Defendants, depriving them of the opportunity to prepare to rebut these new opinions.

It should be noted that Defendants did not make the objection at the time of Dr. Hammock's testimony on this subject matter. What objections were made (i.e., as to opinion on medical records) were sustained in Defendants' favor. (Tr. 10-12). Defendants never object to Dr. Hammock's testimony on the prescription of Premarin. (Tr. 6-7). Essentially, Defendants now argue the testimony by Dr. Hammock (1) as to the Premarin prescription; (2) to the standard of care requiring further assurance that Plaintiff had made an appointment with a surgeon; and (3) as to the standard being violated by failing to notify Plaintiff of a tentative diagnosis of cancer were changes from the opinion as to the standard of care given in pre-trial depositions.

Dr. Hammock acknowledged on cross-examination that his prior opinion had been "incomplete" (Tr. 35-37). Nonetheless, the scope of his testimony was limited to subject matter familiar to both parties and which was the topic of substantial pre-trial discovery by both sides. Although Defendants now claim "surprise" as to the above opinions, they did not promptly complain of "surprise" at trial. Any objections made were to a fact not in evidence, or to the form of the question, never to surprise. (Tr. 13-16). Further, the testimony as to failure to notify of

a tentative diagnosis of cancer was elicited as a hypothetical only. Dr. Hammock never actually said failing to notify of a tentative diagnosis of cancer was a violation. He stated, in response to a hypothetical situation, that a doctor who had tentatively diagnosed a breast cancer and failed to follow up by checking to see if the patient had, in fact, followed through on a referral to verify that diagnosis would be a violation of the standard of care. (Tr. 21-22). He then went on to say such doctor should be sure the patient had an appointment. I do not read this opinion as stating the Defendants fell into this category. Nor do I read it as inconsistent to the pre-trial opinion, only as supplementing it in response to a question posed to him.

As Plaintiff had correctly noted, according to Burks, *Pleadings and Practice*, in order to successfully plead surprise, all of the following requirements must be complied with:

A. That the surprise could not have been guarded against by ordinary prudence;

B. That the surprise was not due to ignorance of law;

C. That there will probably be a different result on a new trial;

D. That Defendants made prompt complaint of the surprise;

E. That the misfortune could not have been averted by the introduction of other available testimony, or by a continuance, or by a dismissal without prejudice. (Burks, *Pleading and Practice*, "Motions After Verdict," Sec. 324, p. 603).

Given that the testimony was on a topic of great discovery and that Defendants failed to object to the prescription testimony at all (and in fact thoroughly cross-examined Dr. Hammock), I do not conclude Defendants have met all of the above tests. At best, one can only surmise as to test C. The motion to set aside on these grounds is denied.

F. *The Court Erred in Excluding the Advisory Opinion of the Medical Malpractice Panel.*

The Medical Malpractice Review Panel in this case returned a finding pursuant to Section 8.01-581.7(A)(4). However, the panel then went further to return a finding also termed an "opinion" that was not within the scope of 8.01-581.7. That statement of the panel which Defendants argue was erroneously excluded was:

the Panel is of the opinion that neither the course of the disease and/or the claimant's life expectancy had been materially changed or altered due to the delay in diagnosis or surgery. (Defendant's Exhibit 2).

The Court permitted a member of the panel, Dr. Robert Allen, to state his personal conclusion agreeing with the above statement but not to state it as the opinion of the panel, since it was *not* a choice set forth in 8.01-581.7.

The language of 8.01-581.7 is very clear as to definition of "opinion." The panel is limited in scope as to what opinions it may render. The section provides the panel "shall have the duty, after deliberation, to render *one or more of the following* opinions . . . ." (emphasis added). The following section, 8.01-581.8, reads "[a]n opinion of the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law . . . ."

Contrary to Defendants' assertions, not *any* opinion of such a panel is admissible under 8.01-581.8. That language *must* be read in conjunction with and in the context of the preceding section defining what an "opinion" is. Section 8.01-581.7 could not be more clear as to what opinions the panel must choose from.

Cases cited by Defendants do not read otherwise. In *Ranier v. Lutz*, 231 Va. 110, 341 S.E.2d 194 (1986), the court admitted the finding of *both* the majority opinion (a finding under 8.01-581.7(A)(2)) and of the minority opinion (a finding under 8.01-581.7(A)(3)). Such a combination of findings is allowable under the clear language of the statute.

In *Lawrence v. Wirth*, 226 Va. 408, 309 S.E.2d 315 (1983), the court admitted the following finding of the review panel:

> that the evidence support[s] a conclusion that the health care provider failed to comply with the appropriate standard of care and that such failure is a proximate cause of the alleged damages; but the evidence does not show that the Defendant's failure to comply with the appropriate standard of care was the proximate cause of Mrs. Lawrence's medical problems *subsequent to December 30, 1977.* [Emphasis added to language omitted by the Defendants in their memorandum].

The *Lawrence* case dealt with a woman who had consulted a physician for a lump in her left breast in August, 1977. That doctor performed a biopsy not of the lump, but of the outer breast tissue, which turned out to be benign. Upon questioning by the patient as to why the lump was still present, the physician made no reply. He did not refer her to any other physician and made no follow-up appointments. By October, 1977, the lump was enlarged. The woman waited to see a surgeon until December, 1977, when the breast had to be removed. Tests one year later revealed metastatic bone cancer which had developed between August and December, 1977. However, *no* evidence of this bone cancer was presented to the Panel since the diagnosis was not made until *after* the Panel hearing. The Panel, therefore, was dealing with a specific time frame of August to December, 1977, and the consequences of the doctor's inaction up to the second operation only. The qualification that its finding was limited to the evidence presented relating to that time frame only is *not* a deviation from the substantive choices under 8.01-581.7 but merely a limitation of its scope.

To the contrary, the "opinion" rendered in the case at bar in no way fits any choice under 8.01-581.7 and in fact exceeds the scope in that once it found a material issue of fact, not requiring an expert opinion, bearing on liability for consideration by a court or jury, it did not stop there as 8.01-581.7(A)(4) seems to require.

The remainder of the finding which was excluded, referred to a question of proximate cause in words chosen by the panel. In doing so, the panel took the section out of context and created an entirely new opinion. Such an action defeats the express statutory language that the panel's opinion must be limited to "one or more of the following" enumerated choices. None of the cited cases justify such a manipulation of the available alternatives. The motion to set aside on this ground is denied.

G. *The Verdict Should Be Set Aside Due To Overwhelming Evidence of Contributory Negligence, or Because It Was Based on Sympathy and Not Reduced Proportionately for the Harm Plaintiff Could Have Avoided.*

In *Lawrence v. Wirth, supra,* the Virginia Supreme Court made it clear that a patient's neglect of his health following his physician's negligent treatment may be a reason for reducing damages but does not bar all recovery. 226 Va. at 412.

Defendants argue there was overwhelming evidence that Dr. Cavender told the Plaintiff to see a surgeon on November 7, 1985, and that she made a note on November 18 on her copy of the mammogram report that she did so. However, when there is conflicting testimony as to a fact in issue, it is a jury function to determine the credibility of witnesses and the weight of their testimony.

The *Lawrence* court also discussed the distinction between contributory negligence and mitigation of damages in a medical malpractice context. In favorably quoting *Jenkins v. Charleston General Hospital and Training School,* 90 W. Va. 230, 110 S.E. 560 (1922), the court noted that "to be contributory, negligence must be contemporaneous with the main fact charged as negligence, and that the patient's negligence after dismissal of the physician or his abandonment of the case does not bar recovery for the negligence of the [physician] committed before termination of the relation." *Lawrence,* 226 Va. at 413.

In viewing the evidence in a light most favorable to the Plaintiff, the delay from November, 1985, to April, 1986, when Plaintiff saw Dr. McKelway, would not bar recovery from the negligent action by Defendants prior to that time. Further, Dr. McKelway's testimony tended

to confirm that Plaintiff's inaction subsequent to November, 1985, was due to the misleading information she received from the Defendants. (McKelway Tr. 14-15).

Defendants have also argued that the large award was simply based on sympathy for the Plaintiff and did not account for any harm the Plaintiff could have avoided on her own. However, given the amount of her present and future medical expenses, her loss of opportunity to be cured of this malady and the pain and suffering undergone by the plaintiff, the award does not seem excessive. Whether the jury discounted or reduced the award based upon the patient's delay in seeking treatment is within the breast of the jury. The Court will deny the motion to set aside on this ground.

### Conclusion

Based upon the conclusions reached as to each assignment of error, the Court will deny the motion to set aside the verdict or to grant a new trial.