JOURNAL ENTRY AND OPINION
Plaintiff-appellant Anthony Liotta, Executor of the Estate of Joan Liotta, appeals the trial court's decision to grant the motion for directed verdict of the defendants-appellees John Rainey and Family Physicians Associates, Inc. The appellant's complaint sets forth three causes of action, however, the appellant has limited this appeal to the second cause of action, the claim for a lost chance of survival under Roberts v. Ohio Permanente Med. Group (1996), 76 Ohio St.3d 483.[1]
During the trial, the appellant presented the expert testimony of Dr. Robert Steele. Dr. Steele testified that Joan Liotta suffered from undifferentiated non-small cell carcinoma of the lungs which metastasized to other organs of her body. Dr. Steele, who specializes in internal medicine and oncology, testified that when lung cancer is found at an early stage it is highly curable (T. 21).
Dr. Steele opined that a chest X-ray should have been performed on Mrs. Liotta on January 25, 1996, because she was coughing and because she had felt unwell from September through the end of January. The October 16, 1995 X-ray was clear, but Dr. Steele testified that had an X-ray been taken on November 25, 1996, the tumor would have been revealed. Dr. Steele believed that the tumor would have been one to two centimeters (T. 35). The tumor was 7.5 centimeters when the diagnosis was finally made. According to the Mayo Clinic, 89% of people with a two-centimeter tumor were free of cancer in ten years (T. 36-37.).
Dr. Steel also opined that an X-ray should have been taken in May 1996, when Mrs. Liotta was once more in the doctor's office. At this point the tumor would have been two or three centimeters. Dr. Steele stated that in January and May he believes that Mrs. Liotta still was in stage one because she was not losing weight and she was not extremely short of breath. The cure rate of a stage one lung cancer, that is cancer which is not in the lymph nodes, is 70% according to Dr. Steele (T. 38).
Dr. Steele testified that by October 16, 1996, the tumor was probably three to five centimeters. At this point, the cure rate was 50% to 60%. By the time Mrs. Liotta appeared in the urgent care center in February 1997 the tumor was 7.5 centimeters and there was no chance of survival at that point. The cancer had spread to her liver, to the skin of the wall of the chest, and to her breast tissue. Dr. Steele stated that at some point in December 1996 and January 1997 the cancer became incurable (T. 41). On cross-examination, Dr. Steele testified that 15% to 20% of lung cancer is caught at a curable stage (T. 61).
At the end of the trial, the appellees renewed their motion for a directed verdict. During the discussion, it became apparent that the appellant originally was going to dismiss the lost chance of survival claim and had not submitted a proposed jury instruction to the court. The appellant determined that the claim should not be let go based upon the testimony of Dr. Steele. The court granted the appellees' motion for a directed verdict on the issue.
The appellant sets forth the following assignment of error:
 THE TRIAL COURT ERRED WHEN IT GRANTED THE DEFENDANTS' MOTION FOR DIRECTED VERDICT AND DISMISSED PLAINTIFF'S CLAIM FOR LOSS-OF-CHANCE OF SURVIVAL.
The appellant asserts that Mrs. Liotta met the test set forth in Roberts, supra, and that the trial court should have permitted the jury to reach a decision on the merits. The appellant argues that the failure to diagnose at the appropriate time increased the risk of harm to Mrs. Liotta. The appellant arrives at this conclusion by asserting that the loss of a chance of survival claim includes the difference between the percentage of a chance of cure once the cancer is detected and the percentage of chance of a cure had the cancer been timely detected. For example, Dr. Steele testified that the chance of a cure in January 1996 was 89%. This percentage dropped to 70% by May 1996 and to 50% to 60% by October 1996. The appellant asserts that this drop in percentage, between 19% to 39% (89%-70%=19% and 89%-50%=39%), represents Mrs. Liotta's lost chance of survival.
The test for determining the appropriateness of granting or denying a Civ.R. 50(A) motion for a directed verdict was recently set forth in Gliner v. Saint-Gobain Norton Indus. Ceramics Corp. (2000),89 Ohio St.3d 414, where the Ohio Supreme Court held:
 Civ.R. 50(A)(4) provides that when a party moves for a directed verdict and "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
An abuse of discretion standard is applied by an appellate court when reviewing a directed verdict. Id. And, in Zavasnik v. Lyons Transp. Lines, Inc. (1996), 115 Ohio App.3d 374, this court held:
 It is the duty of the trial court to submit an essential issue to the jury when there is sufficient evidence, if believed, relating to that issue to permit reasonable minds to reach different conclusions on that issue. O'Day v. Webb (1972), 29 Ohio St.2d 215, 280 N.E.2d 896.
 When a trial court considers a motion for directed verdict, it must determine not whether one version of the facts presented is more persuasive than another but rather whether the trier of fact could reach only one result under the theories of law presented in the complaint. Eldridge v. Firestone Tire Rubber Co. (1985), 24 Ohio App.3d 94, 493 N.E.2d 293. A motion for a directed verdict tests the legal sufficiency of the evidence.
 Id.The trial court may not weigh the evidence or try the credibility of witnesses, but must give to the party opposing the motion the benefit of all reasonable inferences from the evidence. Id. The "reasonable minds" test of Civ.R. 50(A)(4) requires the court only to determine whether there is any evidence of substantial probative value in support of the nonmoving party's claim. Joyce v. General Motors Corp. (1990), 49 Ohio St.3d 93, 551 N.E.2d 172.
The seminal case on the lost chance of survival doctrine is Roberts, supra, where the Ohio State Supreme Court held at syllabus one:
 In order to maintain an action for the loss of a less-than-even chance of recovery or survival, the plaintiff must present expert medical testimony showing that the health care provider's negligent act or omission increased the risk of harm to the plaintiff. It then becomes a jury question as to whether the defendant's negligence was a cause of the plaintiff's injury or death. (Cooper v. Sisters of Charity of Cincinnati, Inc. [1971], 27 Ohio St.2d 242, 56 Ohio Op.2d 146, 272 N.E.2d 97, overruled.)
As Justice Sweeney explained in the body of the opinion:
 In medical malpractice cases, the general rule is that the plaintiff must prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence. Shumaker v. Oliver B. Cannon Sons, Inc. (1986), 28 Ohio St.3d 367, 28 Ohio B.Rep. 429, 504 N.E.2d 44.
 However, the "loss of chance" theory, which compensates an injured plaintiff for his or her diminished chance of recovery or survival, provides an exception to the traditionally strict standard of proving causation in a medical malpractice action. Instead of being required to prove with reasonable probability that defendant's tortious conduct proximately caused injury or death, the plaintiff, who was already suffering from some disease or disorder at the time the malpractice occurred, can recover for his or her "lost chance" even though the possibility of survival or recovery is less than probable. Keith, Loss of Chance:
 A Modern Proportional Approach to Damages in Texas (1992), 44 Baylor L.Rev. 759, 760. The rationale underlying the loss-of-chance theory is that traditional notions of proximate causation may unjustly deprive a plaintiff of recovery in certain cases even where the physician is blatantly at fault; thus, the requirement of proving causation is relaxed to permit recovery. As explained by one court, when a patient is deprived of a chance for recovery, the health care professional should not be allowed to come in after the fact and allege that the result was inevitable inasmuch as that person put the patient's chance beyond the possibility of realization. Health care providers should not be given the benefit of the uncertainty created by their own negligent conduct. To hold otherwise would in effect allow [health] care providers to evade liability for their negligent actions or inactions * * *." McKellips v. St. Francis Hosp., Inc. (Okla. 1987), 741 P.2d 467, 474.
 The loss-of-chance theory has its early roots in the decision of Hicks v. United States (C.A. 4, 1966), 368 F.2d 626. In Hicks, the plaintiff's decedent died from an obstruction of the intestine after being misdiagnosed as suffering from gastroenteritis. Expert testimony established that the decedent would have survived given proper treatment. The defendant argued that proximate causation was not established because it was speculative that surgery would have saved the patient's life. The court, in finding that plaintiff had proved proximate causation, stated the following:
 When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a certainty that the patient would have lived had she been hospitalized and operated on promptly. (Emphasis added.) Id. at 632.
 In addition to the substantial possibility" rule of Hicks, which permits recovery even where there is only a substantial possibility that the result would have been avoided but for the tortious conduct, a number of jurisdictions that have adopted the loss-of-chance theory rely upon 2 Restatement of the Law 2d, Torts (1965), Section 323. This provision provides:
 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm * * *." Most of the courts that apply Section 323 hold that once the plaintiff proves that the defendant has increased the risk of harm by depriving the patient of a chance to recover, the case can go to the jury on the issue of causation regardless of whether the plaintiff could prove to a degree of medical probability that the defendant caused the patient's injury or death. See, e.g., Hamil v. Bashline (1978), 481 Pa. 256, 273, 392 A.2d 1280, 1288; Herskovits v. Group Health Coop. of Puget Sound (1983), 99 Wn.2d 609, 664 P.2d 474.
 Although the plaintiff still has the burden of persuading the jury by a preponderance of the evidence that defendant brought about the harm plaintiff has suffered, the jury, rather than the medical expert, is given the task of balancing probabilities. Hamil, 481 Pa. at 273, 392 A.2d at 1288.
As clearly articulated by the Ohio Supreme Court, the doctrine of loss of a chance of survival applies only to those patients who had less than an even chance of survival when they originally presented themselves to their physician. Under traditional tort law, where a patient would not have survived in any event, the physician was not held accountable for malpractice. In Roberts, the Supreme Court sought to correct this unfair situation by permitting patients to assert claims against physicians who limited their chances of recovery, even though there was a less than even chance of recovery from the start of the consultation with the physician.
The case sub judice presents very different facts. At no time did Dr. Steele testify that Mrs. Liotta had a less than even chance of recovery. While the chance of recovery did decrease, this decrease falls within the traditional tort theories of malpractice.
The trial court properly granted the appellee's motion for a directed verdict. The appellant's assignment of error is overruled.
It is ordered that appellees recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
 ______________________________ JAMES D. SWEENEY, JUDGE
TIMOTHY E. McMONAGLE, P.J., and MICHAEL J. CORRIGAN, J., CONCUR.
[1] The jury found the appellees to be negligent, but returned a defense verdict as to damages regarding the appellant's claim for personal injuries. The remaining cause of action was voluntarily dismissed by the appellant prior to trial.